Bridget Psarianos (AK Bar No. 1705025)
Suzanne Bostrom (AK Bar No. 1011068)
Brian Litmans (AK Bar No. 0111068)
TRUSTEES FOR ALASKA
1026 W. Fourth Avenue, Suite 201
Anchorage, AK 99501
(907) 276-4244
bpsarianos@trustees.org
sbostrom@trustees.org
blitmans@trustees.org

Roger Flynn (CO Bar No. 21078)
WESTERN MINING ACTION PROJECT
P.O. Box 349; 440 Main St. #2
Lyons, CO 80540
(303) 823-5738
wmap@igc.org
(*pro hac vice*)

*Attorneys for Plaintiffs*

## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN ALASKA ENVIRONMENTAL CENTER, ALASKA COMMUNITY ACTION ON TOXICS, ALASKA WILDLIFE ALLIANCE, ALASKANS FOR WILDLIFE, CENTER FOR BIOLOGICAL DIVERSITY, EARTHWORKS, NATIONAL AUDUBON SOCIETY, NATIONAL PARKS CONSERVATION ASSOCIATION, SIERRA CLUB, THE WILDERNESS SOCIETY, and WINTER WILDANDS ALLIANCE, | Case No. 3:20-cv-00187-SLG |

Plaintiffs,

              v.

DAVID BERNHARDT, in his official
capacity as Secretary of the Interior,
ROBERT WALLACE, in his official
capacity as Assistant Secretary for Fish
and Wildlife and Parks, CASEY
HAMMOND, in his official capacity as
Principal Deputy Assistant Secretary
Exercising the Authority of the Assistant
Secretary, Land and Minerals
Management, CHAD PADGETT, in his
official capacity as State Director for the
Bureau of Land Management Alaska,
DAVID HOBBIE in his official capacity
as Regional Regulatory Chief of the
Army Corps of Engineers-Alaska
District, UNITED STATES
DEPARTMENT OF THE INTERIOR,
BUREAU OF LAND MANAGEMENT,
UNITED STATES ARMY CORPS OF
ENGINEERS, NATIONAL PARK
SERVICE, and UNITED STATES
COAST GUARD,

                    Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**
(Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101 *et seq.*; National
Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*; Clean Water Act,
33 U.S.C. §§ 1251 *et seq.*; Federal Land Policy and Management Act of 1976, 43 U.S.C.
§§ 1701 *et seq.*; Administrative Procedure Act, 5 U.S.C. §§ 702–706)

Plaintiffs Northern Alaska Environmental Center, Alaska Wildlife Alliance,

Center for Biological Diversity, Earthworks, National Audubon Society, National Parks

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
                                                    Page 2 of 70
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

Conservation Association, Sierra Club, The Wilderness Society, and Winter Wildlands Alliance (collectively, Plaintiffs) file this Complaint for Declaratory and Injunctive Relief, alleging:

## I. NATURE OF THE CASE

1. The southern Brooks Range and Gates of the Arctic National Park and Preserve (Gates of the Arctic) are iconic areas of Alaskan wilderness. The region and its pristine rivers provide habitat for numerous fish and wildlife species, including salmon, sheefish, caribou, birds, and moose. It offers exceptional recreational experiences, in large part because of its incredible wilderness and wildlife values, and is home to a number of rural communities.

2. Despite these extraordinary values, the Bureau of Land Management (BLM), U.S. Army Corps of Engineers (Corps), and National Park Service (NPS) recently approved a 211-mile industrial road through the heart of this magnificent Alaskan landscape. These agencies issued permits and authorizations to the Alaska Industrial Development and Export Authority (AIDEA), a public corporation owned by the State of Alaska, to build the Ambler Road and other infrastructure cutting across the region. The sole purpose of the Ambler Road is to access the Ambler Mining District, where copper and other metals would be extracted from open-pit mines. AIDEA would provide financing for the road, which would cost nearly $1 billion to build, operate, and

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 3 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

maintain, to serve as a private driveway for mining companies. Communities, tribes, and other entities in the region have passed resolutions in opposition and have voiced serious concerns about the project.

3. AIDEA's permit applications lack basic information regarding the project itself, baseline information about the project area, and information about the mines that would be served by the Ambler Road. The road would cross roughly 2,900 streams and 11 major rivers, including the Kobuk — a designated Wild and Scenic River — and would permanently fill over 2,000 acres of wetlands. Despite glaring deficiencies in AIDEA's applications and the significant impacts that would result from the Ambler Road, BLM, the Corps and NPS nevertheless completed their environmental reviews and approved the permits. The U.S. Coast Guard failed to issue permits for the bridges associated with the road, as required by law.

4. In making their final decisions, BLM, the Corps, and NPS failed to comply with numerous federal statutes and regulations that impose important protections for the lands, wildlife, communities, and aquatic resources of the region. These laws require thorough, transparent, and careful analysis of the significant impacts of the agencies' decisions and mandate that the agencies protect public resources and values within the project area.

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

5. Plaintiffs seek vacatur and declaratory and injunctive relief against the Secretary of the Interior, U.S. Department of the Interior (DOI), BLM, NPS, the Corps, the Coast Guard, and department and agency officials (collectively, Defendants). Defendants' actions and decisions fail to comply with applicable law, are arbitrary, capricious, an abuse of discretion, and not in accordance with the law, in excess of statutory authority, and without observance of the procedure required by law. 5 U.S.C. § 706(2). To the extent Defendants have failed to act, that action is unlawfully withheld or unreasonably delayed. *Id*. § 706(1).

## II. JURISDICTION AND VENUE

6. This Court has jurisdiction over the parties and subject matter of this action under 28 U.S.C. § 1331 (federal question), 1361 (action to compel mandatory duty), 2201 (declaratory relief), and 2202 (injunctive relief).

7. BLM's final environmental impact statement (EIS), the BLM and Corps' joint record of decision (JROD), NPS's Record of Decision (NPS Decision), BLM and the Corps' failure to supplement the EIS, and the Coast Guard's failure to issue a decision consistent with ANILCA Title XI are final agency actions for which Plaintiffs have a right to judicial review under the Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706.

8. Defendants' sovereign immunity is waived pursuant to the APA, 5 U.S.C. § 702.

9. Venue is proper in the District of Alaska under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred within the District of Alaska. Many plaintiffs are also primarily located in or maintain offices in Alaska and the lands at issue in the case are in Alaska.

### III.    PARTIES

<u>Plaintiffs</u>

10. Plaintiff Northern Alaska Environmental Center (Northern Center) is an Alaska nonprofit environmental organization founded in 1971 with over 900 members, sixty percent of whom are located in Alaska. The Northern Center's mission is to promote the conservation of the environment and sustainable resource stewardship in Interior and Arctic Alaska through education and advocacy. One of the Northern Center's major focus areas is its clean water and mining program. The Northern Center actively works to protect the Arctic, its communities, and vital wildlife habitats and wildlands — including the southern Brooks Range where the Ambler Road would be built — from the harms associated with mining and other infrastructure development. The Northern Center also works to amplify the voices of local populations impacted by development. The Northern Center participates in agency decision-making processes related to the Ambler

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

Road, including the challenged action. The Northern Center provides its members and the public with information about the impacts of mining and the Ambler Road, enabling members to participate as well.

11.    Plaintiff Alaska Community Action on Toxics ("ACAT") is an Alaska nonprofit public interest environmental health, research, and advocacy organization dedicated to protecting environmental health and achieving environmental justice. ACAT was founded in 1997 in response to requests from individuals, tribes, and other communities seeking technical assistance because of concerns related to toxic contaminants. ACAT's mission is to assure justice by advocating for environmental and community health because everyone has the right to clean air, clean water, and toxic-free food. The organization works collaboratively with communities to facilitate environmental justice by holding corporations, the military, and governments accountable for their environmental practices. ACAT also helps communities put in place effective strategies to limit their exposure to toxic substances and to protect and restore the ecosystems that sustain them and their way of life. ACAT has tracked and actively participated for many years in decision-making processes relating to the Ambler Road, including reviewing NEPA documents and submitting comments.

12.    Plaintiff Alaska Wildlife Alliance (AWA) was founded by Alaskans in 1978 to protect intact ecosystems so that our state's wildlife can be managed for

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

biodiversity and the benefit of present and future generations. AWA has over 300 members and supporters. AWA and its members speak out against development that unduly threatens vulnerable Alaskan ecosystems and species, including the Ambler Road. AWA is particularly concerned about impacts on the ecosystems and wildlife of the southern Brooks Range, including the Western Arctic Caribou Herd. AWA views the southern Brooks Range as one of the last unspoiled wild areas in the world, and seeks to ensure that it is conserved for future generations of Alaskans and wildlife.

14. Plaintiff Alaskans FOR Wildlife is an Alaskan organized group whose mission is to work through education and advocacy to promote understanding, respect, and protection for Alaskan wildlife. Alaskans FOR Wildlife is an all-volunteer group that is a collection of working and retired professionals and lay persons, including wildlife scientists, educators, mushers, hunters, oilfield workers, wildlife photographers, and those of other pursuits, all interested in promoting the welfare of living wildlife. Alaskans FOR Wildlife has tracked and participated in the permitting process for the Ambler Road, including submitting comments during scoping and on the draft EIS.

14. Plaintiff National Audubon Society (Audubon) is a nonprofit organization. Its mission is to conserve and restore natural ecosystems, focusing on birds, other wildlife, and their habitats for the benefit of humanity and the earth's biological diversity.

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

Audubon uses science, advocacy, education, and conservation to achieve its goal. Audubon operates state programs around the country, including in Alaska, to enable Audubon members and others to create a culture of conservation statewide and in local communities. National Audubon and its state office, Audubon Alaska, work together to conserve Alaska's incredible birds, including birds that rely on the area that will be impacted by the Ambler Road. Through the Audubon Alaska state program, five Alaska chapters, and approximately 4,600 state-based members, Audubon plays an important role in conserving Alaska's natural heritage and has long championed Alaska's special places.

15.     Plaintiff Center for Biological Diversity (Center) is a nonprofit organization with over 74,000 members across the United States and beyond, including Alaska. The Center works through science, environmental law, and creative media to advocate for the protection and recovery of endangered, threatened, and rare species and their habitats throughout the United States, including Alaska. The Center has a long-standing interest in the conservation of threatened and endangered species and their habitats in Alaska. The Center also seeks to safeguard species and habitats from climate change by advocating for reducing greenhouse gas emissions and air pollution. The Center has advocated for protections of the wildlife that occur in the area that will be impacted by the Ambler

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

Road and for avoiding emissions associated with road traffic and development of the Ambler Mining District.

16.     Plaintiff Earthworks is a nonprofit organization dedicated to protecting communities and the environment from the adverse impacts of mineral and energy development while promoting sustainable solutions. Earthworks fulfills its mission by working with communities and grassroots groups to reform government policies, improve corporate practices, influence investment decisions, and encourage responsible materials sourcing and consumption. Earthworks partners with local affected communities and national and international advocates to respond to and solve the growing threats to the earth's natural resources, clean water, biodiversity, special places, and communities from irresponsible mining and mining-related infrastructure, such as the Ambler Road.

17.     Plaintiff National Parks Conservation Association (NPCA) is a non-partisan, nonprofit organization that works to conserve and enhance America's national parks, monuments, and other public lands for current and future generations. Founded in 1919, NPCA is the only membership organization in the United States focused solely on the protection of the National Park System. Headquartered in Washington, D.C., NPCA has offices nationally, including in Alaska. NPCA has over 1.4 million members and supporters, including those living in Alaska, and its members use, enjoy, and work to conserve our National Park System, including Gates of the Arctic. NPCA and its

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

members are actively engaged in protecting the viewsheds, soundscapes, airsheds, watersheds, and other values that make Gates of the Arctic unique and worthy of protection. NPCA plays a crucial role in ensuring America's national park system is protected in perpetuity by undertaking a variety of efforts, including educating decision makers and the public about preserving these landscapes, lobbying members of Congress to uphold legal protections for national parks and other protected lands, and assessing the health of national parks and monuments and advocating for their effective management.

18.     Plaintiff Sierra Club is the nation's oldest and largest grassroots environmental organization. The Sierra Club is a national nonprofit organization of approximately 775,000 members dedicated to exploring, enjoying, and protecting the wild places of Earth; to practicing and promoting the responsible use of the Earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment, and to using all lawful means to carry out these objectives. The Alaska Chapter of the Sierra Club has approximately 1,800 members. The Sierra Club's concerns encompass a variety of environmental issues in Alaska, and the organization has long been active on issues related to the protection of Arctic Alaska, including projects like the Ambler Road.

19.     Plaintiff The Wilderness Society is a nonprofit organization headquartered in Washington, D.C., with offices throughout the country, including a six-person staff in

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 11 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

Case 3:20-cv-00187-SLG   Document 9   Filed 08/13/20   Page 11 of 70

Alaska. Its overall mission is uniting people to protect America's wild places. The Wilderness Society has over a million members and supporters, a portion of which are in Alaska. The goal of its Alaska program is to permanently protect special places in America's Arctic and sub-Arctic, including in the southern Brooks Range. The Wilderness Society has been engaged in Arctic conservation efforts since our inception in the 1930s and has consistently participated in public processes associated with the Ambler Road. Among other areas of focus, staff from The Wilderness Society work to advance scientific understanding and conservation policy for highly migratory caribou that utilize much of the landscape in the region of the Ambler Road to complete their life cycles.

20.     Plaintiff Winter Wildlands Alliance (Winter Wildlands) is a national non-profit organization dedicated to promoting and preserving winter wildlands and a quality human-powered snowsports experience on public lands nationwide. It has over 50,000 members and supporters and 33 affiliated organizations, which together have an estimated additional 137,000 members, including many members who live and recreate in Alaska, including in the area that will be impacted by the Ambler Road. Winter Wildlands is engaged in promoting conservation and preserving opportunities for quiet winter recreation in the southern Brooks Range through agency proceedings and public education, and has participated in decision-making processes related to the Ambler Road.

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 12 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

21.     Plaintiffs participated actively in the administrative process related to the Ambler Road by submitting public comments, giving oral testimony, and engaging their millions of members and supporters to participate in opposition to the Ambler Road to achieve their organizational missions and goals and to protect members' interests. They have engaged in lobbying and other legislative work to halt the permitting and funding of the Ambler Road. Plaintiffs have an interest in ensuring that DOI, BLM, NPS, the Corps, and the Coast Guard comply with applicable laws.

22.     Plaintiffs' members and supporters live, work, visit, and recreate in and around the southern Brooks Range, including those lands and waters that would be impacted by the Ambler Road. Plaintiffs and their members use the area that will be impacted by the Ambler Road for subsistence, recreational, aesthetic, scientific, health, spiritual, cultural, educational, business, photography, wildlife viewing, and other purposes. They also use and enjoy the fish and wildlife that depend on the region, including migratory birds and terrestrial mammals. Plaintiffs' staff, members, and supporters have visited or live in the area, engaged in hunting or fishing practices that depend on the health of wildlife and fish in the region, enjoyed viewing its wildlife, and experienced the wilderness values and habitat that the southern Brooks Range provides. They recreate in the area during multiple seasons because of its exceptional wilderness

---

values and the exceptional peace and quiet of this remote area. Plaintiffs' members plan to return to this area and continue to use and enjoy this area into the foreseeable future.

23. Plaintiffs and their members are harmed by the approval of the Ambler Road. These interests, and the members' and supporters' use and enjoyment of the Ambler Road corridor and adjacent areas, and the resources present in and that rely on the area, will be irreparably harmed by the Ambler Road. Construction, operation, and use of the road will destroy, degrade, and diminish the wild and natural state of this area, will kill, injure, harm, harass, and displace wildlife, and will thus irreparably harm the interests of Plaintiffs' members and supporters.

24. BLM and the Corps' issuance of their JROD and NPS's issuance of its ROD authorizing the Ambler Road and its associated discharges into waters of the U.S. in violation of the law causes imminent harm to the interests of the groups and their members.

25. Defendants' failure to follow the procedures mandated by law further harmed Plaintiffs' and their members' and supporters' ability to engage in the public process and ensure informed decision making.

26. These actual, concrete injuries suffered by Plaintiffs and their members and supporters are fairly traceable to the Defendants' approval of the Ambler Road and violation of the substantive and procedural protections of various laws, including failures

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

to act, and would be redressed by the relief sought in this case. Plaintiffs therefore file this action on behalf of their members who will be adversely affected by the Ambler Road

Defendants

27.     Defendant David Bernhardt is the Secretary of the Interior and is being sued in his official capacity. Secretary Bernhardt is the official ultimately responsible under federal law for ensuring that the actions and decisions of BLM and NPS comply with all applicable laws and regulations.

28.     Defendant Robert Wallace is the Assistant Secretary for Fish and Wildlife and Parks. He is being sued in his official capacity. He has the direct responsibility for programs associated with the management and conservation of natural resources, including the work of NPS, and provides supervision and management of decisions, operations, and activities of NPS. He is the DOI official who approved the challenged right-of-way through Gates of the Arctic.

29.     Defendant Casey Hammond is the Principal Deputy Assistant Secretary Exercising the Authority of the Assistant Secretary for Land and Minerals Management. He has responsibility for programs associated with public land management and BLM's programs. He is the DOI official who approved the challenged right-of-way grant and associated permits over BLM-managed lands.

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

30.     Defendant Chad Padgett is the Alaska State Director for the BLM. He is being sued in his official capacity. Mr. Padgett is responsible for overseeing BLM's activities in Alaska, including the authorization of the Ambler Road.

31.     Defendant David Hobbie is the Regional Regulatory Chief of the Alaska District of the Corps. Mr. Hobbie is responsible for overseeing the Corps' activities in Alaska, including the authorization of the Ambler Road. He is being sued in his official capacity and is the Corps official who approved the challenged decision to issue the 404 Permit.

32.     Defendant DOI is an agency of the United States responsible for oversight of BLM and NPS.

33.     Defendant BLM is an agency within DOI. BLM served as the lead agency for preparation of the Ambler Road EIS, and is responsible for issuing a right-of-way for BLM-managed lands within the road corridor.

34.     Defendant NPS is an agency within DOI. NPS prepared an Environmental and Economic Analysis to determine the route for the Ambler Road through Gates of the Arctic, and is responsible for issuing a right-of-way for the road corridor within Gates of the Arctic.

35.     Defendant Corps is an agency of the U.S. Department of Defense. The Corps is responsible for reviewing and issuing 404 permits under the Clean Water Act

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 16 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

Case 3:20-cv-00187-SLG   Document 9   Filed 08/13/20   Page 16 of 70

(CWA) for the placement of dredged or fill material into jurisdictional waters of the United States.

36.     Defendant U.S. Coast Guard is an agency of the U.S. Department of Defense. The Coast Guard is responsible for reviewing and issuing permits for bridge crossings of navigable waters under the Rivers and Harbors Act.

## IV.    STATEMENT OF FACTS

<u>The Exceptional Values of the Southern Brooks Range and Gates of the Arctic Park and Preserve</u>

37.     The wilderness values of the southern Brooks Range and Gates of the Arctic are incomparable. The area provides unique opportunities to study and understand ecosystems and functions on a landscape scale. The undeveloped and undisturbed character of the area offers world-class wilderness recreation opportunities. The integrity of the area's ecosystems provides unique habitat to numerous wildlife species. In short, the ecological, cultural, and wilderness values of the area are extraordinary.

38.     Gates of the Arctic is one of the premier units of the National Park System and an essential piece of one of the most ecologically intact landscapes on Earth, with over 16 million acres contiguously managed by the NPS. The existing connected, undeveloped, and roadless character of the landscape inside and outside of the boundaries of Gates of the Arctic is at the core of why this area is so ecologically significant.

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

39. People have lived in the Brooks Range for more than 13,000 years, as documented by the thousands of archeological sites in Gates of the Arctic. Today, there are eleven residential communities associated with the Park, and many people continue to conduct subsistence activities within and around Gates of the Arctic. These communities rely on healthy, intact ecosystems and clean air and water to sustain their ways of life.

40. The wilderness, wildlife, and recreational values of the southern Brooks Range have been documented since the early 1930s. After studying the area's natural and cultural landscapes, NPS identified the central Brooks Range as a parkland candidate in the 1960s and 1970s. In 1980, Congress passed the Alaska National Interest Lands Conservation Act (ANILCA), which formally established Gates of the Arctic as a unit of the National Park System.

41. Despite pressure from mining and petroleum developers to create a relatively small park split by a pipeline corridor, the final boundaries drawn for Gates of the Arctic encompassed eight million contiguous acres. At its western end, Gates of the Arctic abuts Noatak National Preserve, and on the east, it stretches toward the Dalton Highway corridor. The Arctic National Wildlife Refuge lies to the east of the Dalton Highway. As such, Gates of the Arctic is the midsection of a nearly 800-mile swath of protected land covering the Brooks Range from end to end.

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

42.     Gates of the Arctic provides a world-renowned visitor experience that is unique within the National Park System. ANILCA mandates that it be managed "[t]o maintain the wild and undeveloped character of the area, including opportunities for visitors to experience solitude, and the natural environmental integrity and scenic beauty of the mountains, forelands, rivers, lakes, and other natural features; to provide continued opportunities . . . for mountain climbing, mountaineering, and other wilderness recreational activities." 16 U.S.C. § 410hh(4)(a). Gates of the Arctic is also managed "to protect habitat for and the populations of, fish and wildlife, including, but not limited to, caribou, grizzly bears, Dall sheep, moose, wolves, and raptorial birds." *Id*.

43.     Congress recognized there was potential interest in the development of mineral resources in the Ambler Mining District. ANILCA contains a provision allowing for "access for surface transportation purposes" across Gates of the Arctic and a process for reviewing an application for a right-of-way to access the mining district. ANILCA § 201(4)(d), Pub. L. 96-487 (Dec. 2, 1980). In granting such access, ANILCA requires that NPS consider routes through Gates of the Arctic that would result in fewer or less severe adverse impacts, and include measures to avoid or minimize negative impacts and enhance positive impacts upon wildlife, fish, and their habitats, and rural and traditional lifestyles, including subsistence activities. *Id*.

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

44.     ANILCA also designated the Kobuk River as a Wild and Scenic River, stretching for 110 miles within Gates of the Arctic. 16 U.S.C. § 1274(a)(31). The Kobuk River flows from its headwaters in the Endicott Mountains and Walker Lake, where many recreational float trips originate, through a broad valley. People have hunted, fished, and lived along the Kobuk for at least 12,500 years, and the river has long been an important transportation route for Indigenous peoples.

45.     The region is home to the Western Arctic Caribou Herd, the largest herd in Alaska. Caribou are an important component of the overall ecosystem of Gates of the Arctic, as well as vital for subsistence users across Western Alaska who rely on caribou migrating through their areas to feed their families.

46.     The region also provides habitat for moose and other terrestrial mammals. Moose are another important subsistence resource for communities in the vicinity of the Ambler Road.

47.     Fisheries are highly important to the area's ecosystem and communities. Fish have been the largest proportion of the subsistence diet in Interior Alaska for thousands of years, including salmon and a variety of whitefish species, such as sheefish. Sheefish are of special importance culturally and as a food source because of their extended season of availability and proximity to communities. Salmon and other species use both large rivers and the numerous tributaries in the region.

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

48.     Mining companies have explored the Ambler Mining District for decades and the area is believed to have mineral resources, including copper, silver, gold, lead, and zinc. Exploration activities have used aircraft and ice roads for access. Development of these potential mineral resources to date has been limited.

49.     There are at least four known deposits in the Ambler Mining District: Arctic, Bornite, Sun, and Smucker. There are also mining claims along the proposed corridor for the Ambler Road.

50.     Trilogy Metals (Trilogy) is conducting mineral exploration activities in the Ambler Mining District, focusing primarily on the Arctic and Bornite deposits. Exploration activities for the Arctic deposit are the furthest along toward development. AIDEA recently stated publicly that no other investors have expressed an interest in developing minerals in the Ambler Mining District.

51.     The stated purpose of the Ambler Road is to access mining interests. Rick Van Nieuwenhuyse, former chief executive of Trilogy, publicly stated, "You build a road, you've got a mine." Yereth Rosen, *The Environmental Review Process is Beginning for a Controversial New Road in Alaska's Arctic*, ARCTIC NOW (Dec. 6, 2017). He also informed AIDEA in January 2020 that Trilogy would submit its required permit applications under Section 404 of the CWA for the Arctic deposit after the Ambler Road

_____
FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

decisions are issued. *See* statements by Rick Van Nieuwenhuyse, AIDEA Board Meeting Draft Minutes (Jan. 15, 2020).

52.     In 2009, the Alaska Department of Transportation and Public Facilities (DOT&PF) began evaluating road and railroad routes to provide access to the Amber Mining District. AIDEA, which has bonding authority and has financed other infrastructure projects in Alaska, later took over as the lead entity on the project.

53.     On November 24, 2015, pursuant to Title XI of ANILCA, AIDEA submitted a consolidated application for the proposed Ambler Mining District Industrial Access Road Project with Defendants.

54.     AIDEA's application requests a right-of-way to construct and operate an all-season, industrial-access road. The sole purpose of the road is to provide industrial access from the Dalton Highway for exploration and development of the Ambler Mining District; AIDEA stated it would not be open to the public.

55.     The road would traverse the southern Brooks Range for approximately 211 miles and pass through lands managed and owned by various entities. The Ambler Road would cross State of Alaska lands for the majority of the road route (61%). The road would traverse approximately 23 miles of BLM-managed lands, and 26 miles in Gates of the Arctic. Finally, approximately 15% of the route would traverse lands owned by Alaska Native Claims Settlement Act (ANCSA) corporations.

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

56.     Several communities and groups that would be directly impacted have passed resolutions opposing the Ambler Road.

57.     AIDEA intends to fund construction of the road, and has stated that "mines using the road to haul ore to market would pay a user fee that would pay back the financing used for the [road's] development and construction." Ambler Access, Funding, http://www.ambleraccess.com/funding.html (last visited July 25, 2020).

58.     All of the Defendants initially and independently determined that AIDEA's application was incomplete because it was missing information needed to process and review AIDEA's proposal under the agencies' respective statutory requirements.

59.     The Coast Guard informed AIDEA that its application was incomplete because it failed to provide site-specific information about the proposed bridge crossings in January 2016.

60.     AIDEA submitted additional information to supplement its application as part of a Revised Permit Application. DOWL, SF 299 Revised Permit Application for Ambler Mining Dist. Indus. Access (June 2016) [hereinafter Revised Permit Application]. As a result, BLM, NPS, and the Corps found that their respective applications were complete. The Coast Guard made no such determination and never received a complete permit application from AIDEA.

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

61.     AIDEA's Revised Permit Application does not contain detailed information about the design or location of the Ambler Road. It also does not contain site-specific baseline information about hydrology, wetlands, air quality, fish and wildlife, and other resources that will be impacted by the road. Despite this, Defendants moved forward with their environmental review processes.

62.     As proposed in 2016, the road would permanently fill approximately 2,059.5 acres of wetlands and 26.6 acres of open waters and would cross roughly 2,900 streams and 11 major rivers, including the Kobuk Wild and Scenic River. The project would discharge 11 million cubic yards of fill into wetlands permanently. Over 300,000 linear feet of stream channel would be temporarily impacted, and over 77,000 linear feet would be permanently impacted.

63.     In February 2017, BLM began the National Environmental Policy (NEPA) process for the Ambler Road. At the same time, NPS began developing an Environmental and Economic Analysis (EEA) for the portion of the road that crosses Gates of the Arctic, as required by ANILCA.

64.     Both the Corps and the Coast Guard are cooperating agencies on the EIS. The Corps' jurisdiction extends to waters of the United States along the full length of the road corridor. The Coast Guard is responsible for permitting approximately 29 bridges over navigable waterways along the road corridor.

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

65.     AIDEA's application states that road construction would occur in three phases, taking place over four to six years. For Phase I, AIDEA would build a seasonal gravel "pioneer road." Road use would be restricted in the spring and summer months because flooding and other seasonal conditions could wash out portions of the road or make it unusable. The pioneer road would then be upgraded in Phase II to a single-lane, gravel-surfaced roadway with year-round access. Phase III would expand the single-lane gravel road into a two-lane gravel road. AIDEA's permit application seeks to construct all three phases, identifying Phase III as the completed project.

66.     The road would require gravel mines — some of which may contain naturally occurring asbestos, a carcinogen — roughly every 10 miles to provide the material needed to build the road, as well as many maintenance stations and camps. The application does not specify whether and how the number and locations of gravel mines would vary between the three phases. The road corridor also contains areas of permafrost and areas with sulfide minerals that have the potential to cause acid rock drainage.

67.     Numerous groups, including many of the Plaintiffs, submitted scoping comments to BLM on the EIS and to NPS on the EEA. The comments outlined numerous legal, technical, and resource issues that the Defendants needed to consider before approving a right-of-way and other federal authorizations for the Ambler Road.

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

68. In August 2019, BLM released the draft EIS for the Ambler Road. BLM, Ambler Road Draft Envtl. Impact Statement (Aug. 2019) (hereinafter DEIS). At the same time, the Corps issued its Public Notice pursuant to Section 404 of the CWA and NPS released its draft EEA.

69. Many groups, tribal organizations, ANCSA Corporations, and individuals submitted comments raising concerns about BLM's draft EIS, the Corps' Public Notice, and NPS' draft EEA. The majority of these comments opposed the Ambler Road.

70. The draft EIS states that "[t]he purpose of the BLM action is to issue a right-of-way grant which provides for: (1) technically and economically practical and feasible year-round industrial surface transportation access in support of mining exploration and development, and (2) construction, operation, and maintenance of facilities associated with that access." DEIS vol. 1, at 1–3.

71. BLM's draft EIS considered a no-action alternative and three action alternatives — Alternatives A (AIDEA's proposed project), B, and C. The action alternatives considered only gravel road access from the Dalton Highway to the Ambler Mining District, using AIDEA's phased approach to construction. DEIS vol. 1, at 2-3–2-4. Alternatives A and B were the same in all respects with the exception of differing routes through Gates of the Arctic.

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

72.     In comments on the draft EIS, numerous organizations, including many of the Plaintiffs (Groups), criticized the agencies' failure to consider mining in the Ambler Mining District as a connected action. *See* Letter from Alaska Cmty. Action on Toxics et al. to Tina McMaster-Goering, Project Manager, BLM 30–47 (Oct. 29, 2019). [hereinafter Groups' Comments]. Similar concerns were raised by members of the public and the U.S. Environmental Protection Agency (EPA).

73.     The draft EIS only contained a cursory review of mining impacts as part of the cumulative effects analysis for the Ambler Road. Groups extensively critiqued the shortcomings of this cumulative effects analysis, including but not limited to the: failure to describe impacts of surface disturbance associated with the mines; failure to consider direct, indirect and cumulative hydrological, wetlands, water quality, and air quality effects of proposed mining projects; failure to analyze impacts of foreseeable access roads associated with mining; failure to include any estimate of gravel needs for mining activities; and failure to adequately consider impacts from releases of hazardous substances. *Id.*

74.     Groups also critiqued the EIS' failure to analyze the significant impacts from AIDEA's proposed gravel mines near and along the Ambler Road corridor as a connected action and to analyze their cumulative impacts. *Id.* at 38–39. BLM stated that it will review and approve these projects later under separate permits. DEIS, vol. 1 at 3-3.

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

75.     Groups also commented extensively on BLM's failure to analyze the impacts from AIDEA's proposal to build the road in phases. Groups explained the environmental harms likely to occur from AIDEA's phased approach. Groups' Comments at 21–22. Groups also pointed out that BLM inappropriately focused only on impacts from the Phase III road design, and did not analyze impacts from the road's other phases. *Id*. at 21, 175–76. Groups' comments also criticized the EIS's failure to assess the cumulative impacts from ongoing construction and maintenance occurring at the same time mining companies would be using the road. *Id*. at 46–47.

76.     Groups also criticized the EIS for failing to analyze the reasonably foreseeable impacts associated with the road one day becoming open to the public, as well as the likely impacts from other foreseeable future uses for activities other than mining. *Id*. at 50–51.

77.     Groups' comments included criticisms of the proposed mitigation measures, pointing out that the EIS lacked site-specific information regarding mitigation measures or adequate analysis of effectiveness of those measures. For example, Groups' Comments relied on and attached extensive technical comments prepared by experts, analyzing the lack of detailed information about the project, lack of baseline information about the aquatic resources and hydrology in the region, and lack of mitigation for aquatic resources. *See generally Id*. at 76–202.

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

78.     The draft EIS states that BLM's authority to require and enforce specific mitigation measures is limited to those lands under its jurisdiction. DEIS, vol. 1 at 3-3. Groups questioned BLM's position, and highlighted that this also ignored the mitigation obligations of other agencies that are relying upon the EIS for their NEPA compliance, particularly the Corps. The supposed limitations on BLM's authority are not reflected in BLM's impacts analysis, which assumes that mitigation measures would apply uniformly across the entirety of the Ambler Road. *See* Groups' Comments at 53–55.

79.     Groups' comments also identified that AIDEA's application lacked critical information for the requested federal permits, including basic information about the project design and location. Groups submitted extensive comments on the EIS's failure to adequately analyze existing conditions and failure to obtain or consider key baseline information necessary to analyze the direct, indirect, and cumulative impacts. *Id*. These resources include but are not limited to greenhouse gas emissions and climate change, air quality, water, caribou, fish, wilderness and recreation, soils, permafrost, vegetation and wetlands, public health, and subsistence uses and resources. *Id*. As a result, the EIS failed to provide an adequate basis to support the agencies' NEPA process and substantive obligations for BLM's right-of-way, the Corps' CWA determinations, and the Coast Guard's bridge permitting decisions. *Id*.

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

80.     Groups also questioned the agencies' ability to comply with ANILCA Title

XI in permitting the Ambler Road, due to the lack of information about the project design

and site-specific information about the project area and impacts. *Id*. at 69–71.

81.     Multiple commenters noted that there was insufficient information for the

Corps to do an analysis and meet its obligations under the CWA. Groups highlighted that

there was insufficient information on which the Corps could base a determination that the

project would not cause significant degradation, along with limited and vague mitigation

measures incorporated into the EIS. *Id*. at 172–202.

82.     On October 28, 2019, the Corps submitted a letter to AIDEA identifying

the Corps' need for additional information and its concerns over the lack of information

in the draft EIS or draft EEA. The Corps identified this missing information as necessary

for the agency to adequately comment or address those documents. FEIS, Responses to

Public Comments, #372. The final EIS did not address the additional information relevant

to these concerns.

83.     EPA is required to review and comment upon the EISs produced by other

federal agencies. 42 U.S.C. § 7609. EPA jointly implements Section 404 of the CWA

with the Corps and is responsible for reviewing 404 authorizations.

84.     EPA's comments on the draft EIS and the Corps' 404 Public Notice raised

a variety of concerns, including but not limited to: a lack of site-specific data to allow for

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 30 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

a full evaluation of temporary, secondary, and cumulative impacts to aquatic resources; failure to determine and select the least environmentally damaging practicable alternative; the lack of meaningful, site-specific mitigation measures that were certain to occur; the complete lack of a compensatory mitigation plan for the project; and a lack of sufficient information to determine that the Ambler Road would not cause significant degradation. Letter from Daniel D. Opalski, Dir., EPA Region 10 Water Div. to Colonel Phillip Borders, Alaska Dist. Eng'r (Oct. 29, 2019) (hereinafter EPA Comments).

85.    As joint administrators of the CWA Section 404 regime, EPA may request that certain permit applications receive a higher level of review by the Corps if EPA determines that issuance of a permit would result in unacceptable adverse effects to Aquatic Resources of National Importance. *See* Clean Water Act Section 404(q) Memorandum of Agreement between the EPA and the Dep't of the Army (Aug. 11, 1992). EPA formally determined that the Ambler Road "may result in substantial and unacceptable impacts to an aquatic resource of national importance" — the Kobuk River and Koyukuk Rivers and associated tributaries and wetlands (including the Nutuvukti fen). EPA Comments.

86.    On March 27, 2020, in the midst of a national and state emergency caused by the outbreak of COVID-19, BLM issued the final EIS for the Ambler Road in

cooperation with the Corps and Coast Guard. EPA, Envtl. Impact Statements, Notice of Availability, 85 Fed. Reg. 17,353 (Mar. 27, 2020).

87.     There were few changes in the final EIS addressing the extensive concerns raised about the project and the agencies' analysis. Despite the concerns raised by Plaintiffs, EPA, local communities, and numerous other commenters, BLM's final EIS still fails to adequately describe or analyze the project design, lacks necessary baseline data, and fails to sufficiently analyze the environmental consequences to numerous resources or the effectiveness of proposed measures to mitigate those impacts. BLM, Ambler Road Final Envtl. Impact Statement (Mar. 2020) (hereinafter FEIS).

88.     In the response to numerous public comments identifying inadequate baseline information and other information about the project design and mitigation measures, BLM, the Corps, and Coast Guard state that they will do additional studies, data collection, and design work for the project after the adoption of the EIS and as part of an unspecified "design/permitting" phase. *See, e.g.*, FEIS, vol. 3 app'x N, at N-19 to -20, N-30, N-32. This to-be-determined information includes "documenting the road location and construction details." FEIS, vol. 3 app'x N, at N-5. Despite acknowledging this design and other information-gathering work will occur in the future, the final EIS makes cursory statements that these yet-to-be-designed project components will be effective in mitigating impacts. *See, e.g.*, FEIS. The final EIS suffered from the same lack

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

of meaningful mitigation measures as the draft EIS and BLM still failed to adequately analyze the effectiveness of those measures.

89.     The final EIS included a potential mitigation measure wherein the agency would require construction of Phase I and Phase II of the Ambler Road to occur simultaneously, but the agencies refused to consider requiring construction of the completed Phase III road design. *Id*. vol. 1 at 2–3. The final EIS likewise failed to consider or analyze the benefits of requiring the use of rigid foam insulation board to reduce the amount of gravel needed for the project, solely referencing this as a potential mitigation measure to reduce permafrost degradation. FEIS, vol. 3 app'x N, at N-10.

90.     The final EIS, like the draft EIS, considered the Phase III road design to be the project proposal for purposes of its impact analysis. FEIS, vol. 1 at 3-2. No additional information or analysis was included regarding impacts from AIDEA's phased approach for constructing the Ambler Road.

91.     The final EIS does not analyze the impacts to resources from public access and other non-mining activities that might occur on the Ambler Road or explain how BLM retains authority to preclude activities on the road outside of BLM-jurisdiction.

92.     Lastly, the final EIS did not provide or analyze additional information and data relevant and necessary for the permitting requirements of the Corps or Coast Guard. Regarding the Coast Guard, BLM stated in its response to comments that the Coast

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 33 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

Guard would obtain and analyze site-specific information about the project as part of a post-NEPA permitting process.

93.     On July 24, 2020, BLM and the Corps issued a joint Record of Decision approving the right-of-way and the CWA 404 permit for the Ambler Road. BLM and Corps, Ambler Road Envtl. Impact Statement Joint Record of Decision (July 2020) (hereinafter JROD). The same day, NPS released its final EEA and DOI issued a Record of Decision approving a right-of-way through Gates of the Arctic. DOI and U.S. Department of Transportation, Record of Decision (July 2020) [hereinafter NPS Decision]. The agencies' decisions purport to approve AIDEA's proposed action (Alternative A), authorizing the northern route through Gates of the Arctic, along with other infrastructure, including a gravel mine. JROD at App. A, Fig. 2, 2.

94.     The Coast Guard did not issue a decision, despite its role in reviewing and authorizing any bridges over navigable waterways for the project.

95.     The JROD states that AIDEA substantially modified its proposal in a revised permit application to the Corps dated February 5, 2020 — after publication of the draft EIS but before issuance of the final EIS. Neither AIDEA nor the Corps made the revised permit application available to the public or provided an opportunity for the public to comment on the revised application.

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

96.     AIDEA substantially modified its project proposal in the revised permit application. According to the JROD, AIDEA's revised application proposed to construct the road to Phase II standards, but not Phase III. JROD at App. F, F-3. The revised permit application also requested 15 material sites and access roads, 4 maintenance stations, 12 communication towers, 3 aircraft landing strips, and a fiber optic cable. *Id.* at F-4. AIDEA changed its requested 404 permit to a 10-year term, in contrast to its 50-year right-of-way requests to NPS and BLM. NPS Decision at 6.

97.     The Corps did not issue a Public Notice or seek comment on this revised permit application. The BLM and the Corps did not issue a supplemental EIS to evaluate the revised permit application. The first time the public was informed about AIDEA submitting a revised permit application was in the JROD.

98.     The Corps determined that the revised version of the project was the least environmentally damaging practicable alternative, and approved the project as described in AIDEA's revised permit application. JROD at 11.

99.     In contrast, BLM and NPS adopted Alternative A as described in the final EIS and AIDEA's original permit application, *i.e.*, the Phase III version of the Ambler Road for a 50-year right-of-way term. *Id.* at 22, B-3; NPS Decision at 6. As a result, BLM's and the Corps' individual decisions within the JROD are inconsistent and relate to different versions of Alternative A.

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 35 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

100.    The JROD does not contain any site-specific detail on the project's location, states that design and other information-gathering work will occur in the future, and relies on to-be-determined measures to support the finding that mitigation will be effective in mitigating impacts. *See, e.g.*, JROD at App. C, C-4 ("Design features related to this mitigation would be determined during the design/permitting phase and would be incorporated into [the right-of-way] authorization and permit stipulations."); *see also id.* at 5 (providing an "estimate" of 29 bridges for the Ambler road, without discussing the additional 20 bridges AIDEA proposes to construct in its revised Corps permit).

101.    The Corps determined that no compensatory mitigation would be required for the Ambler Road. *Id.* at App. F, F-15.

## IV.    LEGAL BACKGROUND

### Alaska National Interest Lands Conservation Act

102.    Congress passed ANILCA "[i]n order to preserve for the benefit, use, education, and inspiration of present and future generations certain lands and waters in the State of Alaska that contain nationally significant natural, scenic, historic, archeological, geological, scientific, wilderness, cultural, recreational, and wildlife values." 16 U.S.C. § 3101(a).

103.    ANILCA sets out a process for NPS' review of an application for a right-of-way to cross Gates of the Arctic to access the Ambler Mining District. 16 U.S.C. §

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 36 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

410hh(4). Under those provisions, NPS is required to prepare an EEA in place of an EIS prepared pursuant to NEPA. *Id.* § 410hh(4)(d). NPS must consider routes and mitigation measures as part of its decision-making process to minimize impacts on Gates of the Arctic's resources, such as wildlife, fisheries, and subsistence. This process is expressly subject to the procedural and substantive requirements of Title XI of ANILCA. *Id.*

104. ANILCA Title XI governs the consideration of transportation systems in conservation system units. Congress intended for Title XI "to minimize the adverse impacts of siting transportation and utility systems within units established or expanded by this Act  and to insure the effectiveness of the decisionmaking process." *Id*. § 3161(c).

105. Title XI of ANILCA establishes a "single comprehensive statutory authority for the approval or disapproval of applications for [transportation and utility] systems" through Alaska's public lands. *Id.* This applies to roads through conservation system units, including units of the National Park System like Gates of the Arctic. *Id.* § 3162(4).

106. Title XI of ANILCA requires that transportation facilities "be approved or disapproved in accordance with the procedures set forth in this subchapter." *Id.* § 3162. Title XI specifically provides that "[n]otwithstanding any provision of applicable law, no action by any Federal agency under applicable law with respect to the approval or disapproval of the authorization, in whole or in part, of any transportation or utility

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 37 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

system shall have any force or effect unless the provisions of this section are complied with." *Id.* § 3164(a).

107. Title XI requires agencies to follow specific procedures when reviewing applications for a transportation system unit across a conservation system unit. These include the use of forms, preparation of an EIS, compliance with explicit timeframes, public involvement, and that each agency involved make specific "detailed findings supported by substantial evidence" related to the transportation system. *Id.* § 3164.

108. Title XI requires applicants to file a consolidated application with each federal agency involved in authorizing the transportation system. *Id.* at 3164(b)–(c). The statute and regulations set out timeframes and requirements for the agencies to either accept or reject an application as complete and for the applicant to provide any missing information. *Id.* § 3164(c)–(d). Under the regulations implementing Title XI, "[i]f the applicant fails to provide all the requested information, the application shall be rejected and returned to the applicant along with a list of the specific deficiencies." 43 C.F.R. § 36.5.

109. Title XI further requires that "each Federal agency shall make a decision to approve or disapprove in accordance with applicable law, each authorization that applies with respect to the [transportation] system and that is within the jurisdiction of that

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

agency" and do so "[w]ithin four months after the final environmental impact statement is published." 16 U.S.C. § 3164(g).

110.    Separately, ANILCA withdrew all units of the National Park System in Alaska "from all forms of appropriation or disposal under the public land laws, including location, entry, and patent under the United States mining laws, disposition under the mineral leasing laws . . . ." 16 U.S.C. § 410hh–5.

National Environmental Policy Act

111.    The National Environmental Policy Act (NEPA) is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's twin aims are to ensure that federal agencies take a hard look at the environmental impacts of their proposed actions before they act and to ensure that agencies provide relevant information to the public so the public can play a role in both the decision-making process and the implementation of the decision. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.16.

112.    NEPA aims to ensure agencies carefully consider information about significant environmental impacts and make that information available to the public prior to making a decision. This analysis "must occur before the proposed action is approved, not afterward." *N. Plains Resource Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1083 (9th Cir. 2011). NEPA seeks to ensure that important effects will not be overlooked

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

or underestimated only to be discovered after an agency has committed resources. 42 U.S.C. § 4332(2)(C).

113.   NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for every major federal action that will have a significant impact on the quality of the human environment. 42 U.S.C. § 4332. An EIS is required to "provide full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. NEPA requires the use of "high quality" information. *Id.* § 1500.1(b). "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implement NEPA." *Id.*

114.   NEPA requires agencies to take a "hard look" at the direct, indirect, and cumulative environmental impacts, as well as the means to mitigate against those adverse environmental consequences. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.14, 1502.16, 1508.7. Cumulative impact is defined as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions." *Id.* § 1508.7.

————————————

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 40 of 70
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

Case 3:20-cv-00187-SLG   Document 9   Filed 08/13/20   Page 40 of 70

115.    To satisfy the "hard look" standard, the agency must provide a "scientific and analytic basis" for comparing the alternatives, meaning the agency must provide "some quantified or detailed information." 40 C.F.R. § 1502.16; *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1379 (9th Cir. 1998). "General statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Id*. at 1380; *see* 40 C.F.R. § 1502.22(a).

116.    NEPA also requires that agencies evaluate the site-specific impacts of an action prior to making an irretrievable commitment of resources. *California v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). An agency cannot defer conducting an analysis of foreseeable impacts by asserting that the consequences are unclear or that the agency will analyze the impacts at a later point in time if the agency is making an irretrievable commitment of resources. *Kern v. U.S. BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002).

117.    The establishment of the baseline conditions of the affected environment is a fundamental requirement of the NEPA process, because an inadequate environmental baseline precludes an accurate assessment of project impacts. *Oregon Nat. Desert Ass'n v. Jewell*, 823 F.3d 1258 (9th Cir. 2016). "[W]ithout [baseline] data, an agency cannot carefully consider information about significant environment impacts. Thus, the agency fails to consider an important aspect of the problem, resulting in an arbitrary and

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

capricious decision." *N. Plains Resource Council, Inc. v. Surface Transp. Bd.,* 668 F.3d 1067, 1085 (9th Cir. 2011).

118.    To determine the scope of environmental impact statements, agencies shall consider connected actions. Connected actions are those that either automatically trigger other actions that may require environmental impact statements, cannot or will not proceed unless other actions are taken previously or simultaneously, or are interdependent parts of a larger action and depend on the larger action for their justification. 40 C.F.R. § 1508.25(a). When determining the contents of an EIS, an agency must consider all connected, cumulative, and similar actions. *Id.*

119.    Agencies are also required to consider mitigation as part of their NEPA analysis. *Id.* §§ 1502.14(f), 1502.16(h). Mitigation includes consideration of how to avoid impacts completely by not taking a certain action or parts of an action; minimize impacts by limiting the degree or magnitude of the action and its implementation; address the impact by repairing, rehabilitating, or restoring the affected environment; reduce the impact over time through preservation and maintenance; and compensate for the impact. 40 C.F.R. § 1508.20.

120.    An agency must evaluate the effectiveness of any mitigation measures it adopts and relies on in approving an agency action. *Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1381 (9th Cir. 1998). "All relevant, reasonable mitigation

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperating agencies . . . ." *Forty Most Asked Questions Concerning CEQ's Nat'l Envtl. Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,031 (Mar. 23, 1981).

121.   Agencies are required to prepare supplements to either draft or final EISs if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or there is "significant new . . . information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1); *see Dubois v. U.S. Dep't of Agriculture*, 102 F.2d 1273, 1291–92 (1st Cir. 1996).

122.   On July 16, 2020, the Council on Environmental Quality issued a new rule to revise the NEPA regulations, which takes effect on September 14, 2020.  85 Fed. Reg. 43304 (July 16, 2020).  The reviewing court is to look to the regulations that were in place at the time of the challenged decision, which in this case is July 23, 2020. *Covey v. Hollydale Mobilehome Estate*, 116 F.3d 830, 835 (9th Cir. 1997) (explaining that courts generally disfavor retroactivity and statutes and administrative rules "will not be construed to have retroactive effect unless their language requires this result" (quoting *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988))).

<u>Clean Water Act</u>

123.   Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

124.   The CWA prohibits the discharge of pollutants, including dredged or fill material, into the waters of the United States unless authorized by a permit. *Id.* § 1311(a).

125.   Section 404 of the CWA authorizes the Corps to issue permits, after notice and opportunity for public comment, for the discharge of dredge or fill material into waters of the United States "at specified disposal sites." *Id.* § 1344. The Corps must provide a public notice "contain[ing] a statement explaining how impacts associated with the proposed activity are to be avoided, minimized, and compensated for." 33 C.F.R. § 332.4(b)(1). The 404 Permit for the Ambler Road is subject to this "public review and comment" requirement.

126.   "Public notice is the primary method of advising all interested parties of the proposed activity for which a permit is sought, and of soliciting comments and information necessary to evaluate the probable impact on the public interest. The notice must, therefore, include sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment." *Id.* § 325.3(a).

127.   The Corps' regulations contain express requirements for applications for permits issued under Section 404. A complete application "must include a complete description of the proposed activity including necessary drawings, sketches, or plans

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 44 of 70
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

sufficient for public notice," as well as the location and scheduling of the activity. *Id.* § 325.1(d)(1). The application must also provide "a description of the type, composition and quantity of the material to be dredged, the method of dredging, the site and plans for disposal of the dredged material," and "the location of the disposal site." *Id.* §§ 325.1(d)(3)–(4).

128.  EPA, in conjunction with the Corps, has developed guidelines — known as the "404(b)(1) Guidelines" — for discharging fill material under Section 404 of the CWA. 40 C.F.R. § 230.2(a). The Guidelines' purpose is to ensure that "dredged or fill material should not be discharged into the aquatic ecosystem, unless it can be demonstrated that such a discharge will not have an unacceptable adverse impact either individually or in combination with known and/or probable impacts of other activities affecting the ecosystems of concern." *Id.* § 230.1(c). A 404 permit must be denied if the discharge would not comply with the Guidelines. 33 C.F.R. § 320.4(a)(1).

129.  "The burden of proof to demonstrate compliance with the Guidelines rests with the applicant; where insufficient information is provided to determine compliance, the Guidelines require that no permit be issued." *Id.* § 230.12(a)(3)(iv).

130.  Under the 404(b)(1) Guidelines, the Corps is also prohibited from issuing a 404 permit if the proposed discharge of dredged or fill material "will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c). The

Guidelines specify that effects that contribute, either individually or collectively, to significant degradation include impacts to (1) human health and welfare, including to fish, wildlife, and special aquatic sites; (2) aquatic life and other wildlife, which could be exposed to chemicals or other byproducts stemming from the discharge; (3) aquatic ecosystem diversity, productivity, and stability, including the loss of habitat; or (4) recreational, aesthetic, and economic values. *Id.*

131.    To ensure these requirements are satisfied, the Corps must fully evaluate the direct, indirect, secondary, and cumulative impacts of the activity, including impacts to the aquatic ecosystem, fish and wildlife, recreation, and aesthetics. *See*, *e.g.*, 33 C.F.R. §§ 336.1(c)(8) (fish and wildlife); 40 C.F.R. §§ 230.11(a)–(h), 230.20–23 (aquatic ecosystem); *id.* § 230.31–32 (fish and wildlife); *id.* § 230.51 (recreational and commercial fisheries); *id.* § 230.52 (water-related recreation); *id.* § 230.53 (aesthetics).

132.    The Guidelines require the Corps to make detailed factual determinations regarding the direct, indirect, and secondary effects associated with the discharge activity to ensure it will not cause or contribute to significant degradation. *Id.* § 230.10(c). Secondary effects on the aquatic ecosystem are associated with a discharge of dredged or fill materials, but do not result from the actual placement of the dredged or fill material. *Id.* § 230.11(h). Secondary effects are not limited in time or space to the initial discharge; they encompass all activities and impacts associated with the fill activities.

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 46 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

133.     The Corps must deny a 404 permit if "[t]here does not exist sufficient information to make a reasonable judgment as to whether the proposed discharge will comply with these Guidelines." *Id.* § 230.12(a)(3)(iv).

134.     The Guidelines prohibit the Corps from issuing a 404 permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." *Id.* § 230.10(d). Applicants must mitigate the impacts of the proposed dredge and fill activities by "avoiding, minimizing, rectifying, reducing, or compensating for resource losses." 33 C.F.R. § 320.4(r)(1).

135.     The Guidelines also require full mitigation of a project's impacts. Mitigation is required for "significant resource losses which are specifically identifiable, reasonably likely to occur, and of importance to the human or aquatic environment." *Id.* § 320.4(r)(2). These adverse effects to aquatic resource functions, whether direct or indirect, must be mitigated. *Id.*; 40 C.F.R. § 230.93(a).

136.     To the extent other types of mitigation are unable to completely eliminate the impacts, the Corps "must determine the compensatory mitigation to be required in a [404] permit, based on what is practicable and capable of compensating for aquatic resource functions that will be lost as a result of the permitted activity." *Id.* The purpose of the compensatory mitigation program is to offset unavoidable impacts from issuance of the Corps' 404 permit. *Id.* § 230.91(a)(l).

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

<u>Federal Land Policy and Management Act</u>

137.    The Federal Land Policy and Management Act (FLPMA) is BLM's

"organic act" and establishes the agency's mandate to manage lands for multiple uses. In

passing FLPMA, Congress intended for "the public lands be managed in a manner that

will protect the quality of scientific, scenic, historical, ecological, environmental, air and

atmospheric, water resource, and archeological values; that, where appropriate, will

preserve and protect certain public lands in their natural condition; that will provide food

and habitat for fish and wildlife and domestic animals; and that will provide for outdoor

recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).

138.    FLPMA governs BLM's issuance of rights-of-way across public lands

under BLM's jurisdiction. Under FLPMA, BLM may grant a right-of-way only if it

"protect[s] the public interest in the lands traversed by the right-of-way or adjacent

thereto." *Id*. § 1765(b). FLPMA contains both substantive and procedural requirements.

139.    FLPMA's right-of-way provisions contain important substantive

requirements. The right-of-way can only be issued if activities resulting from it: (i)

protect Federal property and economic interests; (ii) efficiently manage the lands subject

and adjacent to the right-of-way and protect the other lawful users of those lands; (iii)

protect lives and property; (iv) protect the interests of individuals living in the general

area traversed by the right-of-way who rely on the fish, wildlife, and other biotic

_____
FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 48 of 70
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

Case 3:20-cv-00187-SLG   Document 9   Filed 08/13/20   Page 48 of 70

resources of the area for subsistence purposes; (v) require location of the right-of-way along a route that will cause least damage to the environment, taking into consideration feasibility and other relevant factors; and (vi) otherwise protect the public interest in the lands traversed by the right-of-way or adjacent thereto. *Id.*

140.    A right-of-way grant must "do no unnecessary damage to the environment" *Id*. § 1764(a). BLM has a mandatory duty to impose conditions that "will minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." *Id.* § 1765(a).

141.    These provisions require that BLM fully analyze and impose conditions that protect not only the land crossed by the right-of-way, but all federal lands and public resources that may be affected by the construction and use of the Ambler Road and its associated infrastructure (including impacts from exploration and mining in the Ambler Mineral District) made possible by BLM's approval of the right-of-way.

142.    Further, "[e]ach right-of-way shall be limited to the ground which the Secretary concerned determines [] will be occupied by facilities which constitute the project for which the right-of-way is granted, issued, or renewed [and] to be necessary for the operation or maintenance of the project." *Id*. § 1764(a).

143.    FLPMA also contains procedural requirements for the granting of a right-of-way, including information the right-of-way applicant must provide to BLM. A right-

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

of-way application such as for the challenged Ambler Road requires submission of a detailed plan of construction, operation, and rehabilitation. *Id.* § 1764(d).

144. A complete right-of-way application must minimally include: a full description of the project and its facilities; the schedule for constructing, operating, maintaining, and terminating the project and its estimated life; proposed construction and reclamation techniques; a statement of financial and technical capability to construct, operate, maintain, and terminate the project; and any plans, contracts, agreements, or other information concerning the applicant's use of the right-of-way. 43 C.F.R. § 2804.12(a).

145. Finally, FLPMA requires coordination of applications among federal agencies involved in granting a right-of-way across public lands. 43 U.S.C. § 1771.

Administrative Procedure Act

146. Courts review agency actions under the Administrative Procedure Act (APA). 5 U.S.C. §§ 702, 704.

147. Under the APA, Courts "hold unlawful and set aside agency actions, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," in excess of statutory authority, or made "without observance of procedure required by law." *Id.* § 706(2)(A), (D). Further, a reviewing

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 50 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

Case 3:20-cv-00187-SLG   Document 9   Filed 08/13/20   Page 50 of 70

court "shall compel agency action unlawfully withheld or unreasonably delayed." *Id.* §
706(1).

**CLAIMS FOR RELIEF**

**COUNT I: VIOLATION OF ANILCA**

*Count I(A): Failure by NPS, BLM, the Corps, and the Coast Guard to Comply with ANILCA Title XI*

148.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–145.

149.    Defendants must comply with Title XI of ANILCA for the Ambler Road. 16 U.S.C. §§ 410hh(4), 3164.

150.    Title XI of ANILCA and its implementing regulations require applicants to file a consolidated application at the same time with all federal agencies involved in the review of a proposed transportation system through a conservation system unit, such as Gates of the Arctic. 16 U.S.C. § 3164(a)–(d). It also requires that all federal agencies issue their respective decisions to approve or deny a permit application within four months of issuance of a final EIS. *Id*. at § 3164(g).

151.    The Coast Guard is the agency tasked with reviewing and approving any bridge crossings over navigable waterways pursuant to Section 9 of the Rivers and Harbors Act. 33 U.S.C. § 491. The BLM, NPS, and Corps are tasked with issuing rights-of-way and other permits for the Ambler Road as described in the preceding paragraphs.

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

152.    AIDEA submitted a consolidated application for the Ambler Road pursuant to Title XI to each of the Defendants on November 24, 2015.

153.    The Coast Guard rejected AIDEA's application for the bridge crossings for the Ambler Road as incomplete in January 2016. AIDEA never submitted a complete permit application to the Coast Guard.

154.    To the extent BLM, NPS, and the Corps found that their respective applications were complete, that finding was arbitrary and capricious and contrary to law.

155.    Despite the fact that AIDEA never submitted a complete application to all the federal agencies involved in reviewing and permitting the Ambler Road, Defendants went ahead with the environmental review process for the project and BLM, the Corps, and NPS approved the road.

156.    The Ambler Road was not approved pursuant to Title XI's procedures because the Defendants failed to require a complete, consolidated application from AIDEA for the Ambler Road and because the Coast Guard did not issue its decision within the timeframe provided by Title XI.

157.    BLM, NPS, and the Corps' joint approval of the Ambler Road without complying with Title XI of ANILCA is arbitrary, capricious, an abuse of discretion, was done without observance of procedure required by law, and is otherwise not in accordance with law. 5 U.S.C. § 706(2). The Coast Guard's failure to approve or deny a

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 52 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

Case 3:20-cv-00187-SLG   Document 9   Filed 08/13/20   Page 52 of 70

permit within the prescribed four-month period following issuance of the FEIS

constitutes agency action unlawfully withheld and unreasonably delayed in violation of 5

U.S.C. § 706(1) and Title XI of ANILCA.

158.    BLM's, the Corps', and NPS's approvals for the Ambler Road are,

therefore, without "any force or effect," and should be declared null and void. 16 U.S.C.

§ 3164(a).

### Count I(B): Authorization of Gravel Mining in Gates of the Arctic in Violation of ANILCA

159.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in

paragraphs 1–156.

160.    Section 206 of ANILCA withdrew all units of the National Park System in

Alaska "from all forms of appropriation or disposal under the public land laws, including

location, entry, and patent under the United States mining laws, disposition under the

mineral leasing laws . . . ." 16 U.S.C. § 410hh–5.

161.    No other provision of ANILCA overrides this withdrawal for purposes of

the Ambler Road.

162.    Despite express language in ANILCA withdrawing units of the National

Park System from all forms of appropriation or disposal under the public land laws, NPS,

the Corps, and BLM authorized AIDEA to develop a gravel mine site within the

boundaries of Gates of the Arctic in their decisions.

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 53 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

163. BLM's, the Corps', and NPS's approval of gravel mining within Gates of the Arctic violates ANILCA, is in excess of the agencies' statutory authority, and is arbitrary, capricious, and not in accordance with the law. 5 U.S.C. § 706(2).

## COUNT II: VIOLATION OF NEPA BY BLM AND THE CORPS

*Count II(A): Failure to Take a Hard Look at Direct, Indirect, and Cumulative Impacts and Mitigation Measures*

164. Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–161.

165. Pursuant to NEPA, agencies must take a "hard look" at the consequences, environmental impacts, and adverse effects of their proposed actions and evaluate mitigation measures. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1502.14, 1502.16. NEPA requires that an EIS include a detailed analysis of the direct, indirect, and cumulative impacts of the proposed action together with the impacts of past, present, and reasonably foreseeable activities. 40 C.F.R. § 1508.7.

166. BLM and the Corps violated NEPA and its implementing regulations in their evaluation and approval of the Ambler Road because the agencies failed to obtain sufficient information about the project's location and design to enable the agencies to take a hard look at the impacts of the Ambler Road or how to mitigate those impacts.

167. BLM and the Corps also failed to take a hard look at the potential direct, indirect, and cumulative impacts of construction, operation, and maintenance of the road

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 54 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

to a wide range of resources. This includes but is not limited to failing to analyze the impacts from reasonably foreseeable public access of the road and failing to consider impacts from operation and use of the road occurring simultaneously with impacts from construction of subsequent phases.

168.    BLM and the Corps failed to adequately analyze the cumulative impacts from reasonably foreseeable mining development in the Ambler Mining District by failing both to consider Trilogy's proposal in particular, as well as other foreseeable mining impacts likely to occur from expanded access, exploration, and development of other mines. The agencies also failed to consider reasonably foreseeable impacts from AIDEA's proposal to construct and develop numerous gravel mine sites along the road corridor to enable construction of the Ambler Road.

169.    The EIS also fails to provide an adequate discussion of potential direct, indirect, or cumulative impacts of the Ambler Road. These violations include, but are not limited to, the failure to adequately analyze impacts to a wide range of resources including air quality and greenhouse gas emissions, aquatic resources, fish, caribou, permafrost, vegetation, and wetlands. These violations are compounded by the agencies' failure to have sufficient information about the baseline conditions of the affected resources.

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

170.    BLM's and the Corps' cursory analysis of potential mitigation measures and their effectiveness is insufficient to show that the agencies properly evaluated the environmental consequences of their actions to authorize the Ambler Road or ways to avoid those consequences.

171.    BLM's and the Corps' failure to take a hard look at the direct, indirect, and cumulative impacts of the Ambler Road, and failure to adequately evaluate the effectiveness of mitigation measures, renders the final EIS and JROD arbitrary, capricious, and not in accordance with the law, and their issuance and adoption of the final EIS and JROD was done without observance of the procedure required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

### Count II(B): Failure to Obtain Sufficient Information Regarding Baseline Environmental Conditions

172.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–169.

173.    NEPA requires that the EIS "describe the environment of the area(s) to be affected or created by the alternatives under consideration." 40 CFR § 1502.15. The establishment of the baseline conditions of the affected environment is a fundamental requirement of the NEPA process.

174.    BLM and the Corps failed to obtain key baseline information necessary to evaluate the impacts to resources potentially affected by the project and related

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

infrastructure and facilities. This included the failure to obtain baseline information, including but not limited to air quality and greenhouse gas emissions, surface and ground water quality and quantity, recreation, subsistence uses, aquatic resources and hydrology, wildlife (including caribou), fish, permafrost, vegetation, and wetlands.

175.   BLM's and the Corps' failure to obtain this baseline information renders the final EIS and JROD arbitrary, capricious, and not in accordance with the law, and their issuance and adoption of the final EIS and JROD was done without observance of the procedure required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

### Count II(C): Failure to Consider Connected Actions

176.   Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–173.

177.   Pursuant to NEPA, agencies must consider "connected actions" together in a single EIS. 40 C.F.R. § 1508.25(a)(1). Connected actions are those that cannot or will not proceed unless other actions are taken previously or simultaneously, or are interdependent parts of a larger action and depend on the larger action for their justification. *Id.*

178.   The sole purpose and justification for construction, operation, and maintenance of the Ambler Road is to provide access for mineral exploration and mining

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

in the Ambler Mining District. Trilogy Metals has repeatedly asserted that without road access mining development will not move forward, and that the company intends to seek permits for mining development at the Arctic deposit once Defendants authorize the Ambler Road.

179.    Separately, the EIS and AIDEA's application state that AIDEA would obtain gravel and related materials at numerous gravel mine sites near and along the Ambler Road. AIDEA's proposed project includes the gravel mining sites and additional infrastructure. AIDEA would not pursue gravel mines but for construction of the Ambler Road and the gravel mines would be developed solely for construction of the Ambler Road.

180.    Despite these facts, BLM and the Corps failed to consider either development of a mine at the Arctic deposit in the Ambler Mining District or the gravel mines and associated development activities as connected actions in the EIS for the Ambler Road.

181.    BLM's and the Corps' failure to consider these components as connected actions violates NEPA and renders the final EIS and JROD arbitrary, capricious, and not in accordance with the law and their issuance and adoption of the final EIS and JROD was done without observance of the procedure required by NEPA, its implementing regulations, and the APA. 5 U.S.C. § 706(2).

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

***Count II(D): Failure to Supplement the EIS***

182.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–179.

183.    Agencies are required to prepare supplements to either draft or final environmental impact statements if the agency "makes substantial changes in the proposed action that are relevant to environmental concerns" or there is "significant new . . . information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1); *see Dubois v. U.S. Dep't of Agriculture*, 102 F.2d 1273, 1291–92 (1st Cir. 1996).

184.    BLM and the Corps violated NEPA by failing to prepare a supplemental EIS to analyze the revised permit application the Corps received in February 2020. The revised application made substantial changes to the proposed action that were relevant to environmental concerns, including 20 new bridge crossings, access roads, 4 maintenance stations, and 12 communication towers. The revised application was submitted after the draft EIS, but was never subject to public notice or review, and the agencies did not update the final EIS to analyze the new application.

185.    For each of the above reasons, and others, BLM's and the Corps' refusal to prepare a supplement to the EIS is agency action unlawfully withheld and/or unreasonably delayed within the meaning of section 706(1) of the APA. 5 U.S.C. §

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

706(1). This failure was arbitrary, capricious, and not in accordance with the law and was

without observance of the procedure required by NEPA, its implementing regulations,

and the APA. 5 U.S.C. § 706(2).

## COUNT III: VIOLATION OF THE CLEAN WATER ACT BY THE CORPS

### Count III(A): Insufficient Information to Determine Significant Degradation & Authorizing an Activity That Will Cause or Contribute to Significant Degradation of Waters of the U.S.

186.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in

paragraphs 1–183.

187.    Under the 404(b)(1) Guidelines, the Corps is prohibited from issuing a 404

permit if the proposed discharge of dredged or fill material "will cause or contribute to

significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c).

188.    The Corps cannot authorize a discharge without "sufficient information to

make a reasonable judgment as to whether the proposed discharge will comply with

Guidelines." *Id*. § 230.12(a)(3)(iv).

189.    The Corps lacks sufficient information to determine whether the authorized

discharges and the resulting direct, indirect, secondary, and cumulative effects may cause

and contribute to significant degradation of waters of the United States. *Id*. § 230.10(c).

The Corps does not have sufficient information on which to base its factual

determinations regarding impacts to aquatic resources and the likelihood of significant

Case 3:20-cv-00187-SLG   Document 9   Filed 08/13/20   Page 60 of 70

degradation. These shortcomings include, but are not limited to: a lack of site-specific data for temporary, secondary, and cumulative impacts to aquatic resources to allow for a full evaluation of impacts to the project area and downstream waters; incomplete and inaccurate wetland mapping with data gaps in the delineation of aquatic resources; lack of information on fisheries resources and impacts; and lack of site-specific information on the location of gravel mining sites. The Corps also failed to adequately consider impacts of contamination from naturally occurring asbestos and acid rock drainage. In sum, the Corps lacks sufficient information regarding the project description, baseline environmental conditions, and information on the wetlands and hydrology in the project area to make a reasonable determination that the discharge will not cause or contribute to significant degradation.

190. The Corps' decision to issue the 404 Permit violates the CWA and the 404(b) Guidelines because the authorized discharges and the resulting direct, indirect, secondary, and cumulative effects will cause and contribute to significant degradation of waters of the United States. *Id*. In the JROD, the Corps states that the limited version of the Ambler Road that it is permitting would permanently fill 1,431 acres of wetlands and 0.5 acre of open water with 8,460,218 cubic yards of fill material, permanently impact approximately 250,435 linear feet of stream channel, temporarily impact 333.6 acres of wetlands and 0.1 acre of open water with 50,190 cubic yards of fill material, and

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

indirectly impact 17,187 acres of wetlands due to dust deposition. JROD at App F., F-4. The cumulative impacts of the Ambler Road could result in "major impacts" to fish and other aquatic resources, disruption of natural surface and groundwater interactions and processes, loss of wetlands, and potential degradation of water quality. *Id* at F-38. Thus, the direct, indirect, secondary, and cumulative effects of the discharges into the waters of the U.S. for the Ambler Road would cause or contribute to significant degradation of the aquatic ecosystems of the Brooks Range.

191. Because the Corps did not have sufficient information to make a determination related to significant degradation and nonetheless authorized the Ambler Road, which would cause or contribute to significant degradation, the Corps' decision is arbitrary, capricious, an abuse of discretion, contrary to the CWA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law. 5 U.S.C. §706(2).

### Count III(B): Failure to Properly Consider Indirect, Secondary, and Cumulative Effects

192. Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–189.

193. Under the CWA and its implementing regulations, the Corps must fully evaluate the indirect, secondary, and cumulative impacts of the permitted activity, including impacts to the aquatic ecosystem, fish and wildlife, aesthetics, recreation, and

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

cultural resources. The Corps must make a detailed "[d]etermination of secondary effects on the aquatic ecosystem." 40 C.F.R. § 230.11(h).

194.    The Corps' did not obtain sufficient information regarding the indirect, secondary, and cumulative impacts of construction, operation, and maintenance of the Ambler Road on water flows, water quality, wildlife, and other significant and important public resources in deciding to issue the 404 Permit, nor did the Corps subject these required analysis to the required full public review.

195.    The Corps' failure to consider the indirect, secondary, and cumulative impacts of the Ambler Road, including impacts from the construction and operation of the gravel mines, mining activity in the Ambler Mining District, impacts to aquatic resources in the project area and downstream waters, and impacts of contamination from naturally occurring asbestos and acid rock drainage, is arbitrary, capricious, an abuse of discretion, contrary to the CWA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA. 5 U.S.C. § 706(2).

196.    The Corps' failure to consider the indirect, secondary, and cumulative water quality impacts caused by Ambler Mining District operations is arbitrary, capricious, an abuse of discretion, contrary to the CWA and its implementing regulations,

not in accordance with the law, and without observance of procedures required by law. 5 U.S.C. § 706(2).

### Count III(C): Failure to Adequately Analyze and Mitigate Impacts

197.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–194.

198.    The 404(b) Guidelines prohibit the Corps from issuing a 404 permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.10(d). The Guidelines also require full mitigation of a project's impacts, including compensatory mitigation to "offset unavoidable impacts" to waters of the United States. *Id.* § 230.93(a)(l).

199.    The mitigation measures described in the JROD rely on additional information and future site-specific decisions to implement mitigation measures for the project. This does not fulfill the Corps' obligations to mitigate adverse impacts to aquatic resources across the entirety of the Ambler Road corridor. Moreover, the Corps failed to require any compensatory mitigation to offset the unavoidable adverse impacts from the Ambler Road. 40 C.F.R. § 230.91.

200.    The Corps' failure to adequately analyze, minimize, and mitigate the impacts resulting from construction, operation, and maintenance of the Ambler Road,

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 64 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

including indirect, secondary, and cumulative impacts, and the Corps' failure to adopt an adequate mitigation plan, is arbitrary, capricious, an abuse of discretion, contrary to the CWA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law. 5 U.S.C. § 706(2).

***Count III(D): Failure to Provide for Public Review***

201.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–198.

202.    Under the Corps permitting regulations, all new proposed discharges must first be included in a formal application, with detailed requirements, to ensure "sufficient public notice." 33 C.F.R. § 325.1(d)(1).

203.    On February 5, 2020, AIDEA amended its 404 permit application. Through this amended application, AIDEA adjusted the requested term for the 404 permit, reduced the proposed road width, added 20 new bridge crossings, and applied for construction of 15 material sites and access roads, 4 maintenance stations, and 12 communication towers.

204.    Neither the Plaintiffs nor the general public were given an opportunity to comment upon these new proposed discharges and other new information during the Corps' public notice or NEPA process.

205.    The Corps' failure to provide the required opportunities for public review of AIDEA's application is arbitrary, capricious, an abuse of discretion, contrary to the

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
Page 65 of 70
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

CWA and its implementing regulations, not in accordance with the law, and without observance of procedures required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA. 5 U.S.C. § 706 (2).

## COUNT IV: VIOLATION OF FLPMA BY BLM

### *Count IV(A): Failure to Protect the Environment and Public Interest*

206.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–203.

207.    In issuing a right-of-way, BLM has a mandatory duty to impose conditions that will "minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment." 43 U.S.C. § 1765(a).

208.    In granting the right-of-way for the Ambler Road, BLM failed to meet the strict public interest and environmental protection requirements of FLPMA. In the JROD, BLM makes conclusory statements that the Ambler Road and future mining enabled by it would result in job creation, revenues to the State of Alaska, and revenues to local corporations via land use agreements. JROD at 10. BLM fails to justify its findings about these financial benefits, and in particular fails to explain its assumptions regarding land use agreements in light of the fact that no such agreements presently exist. BLM further failed to properly take into account other factors relevant to the public interest, such as wildlife, subsistence, water quality, public health, and air quality impacts.

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 66 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

Case 3:20-cv-00187-SLG   Document 9   Filed 08/13/20   Page 66 of 70

209. BLM's failure to comply with NEPA (as set out in Count II) also renders its public interest determination invalid. "Without an accurate picture of the environmental consequences of the [project], the BLM cannot determine if the 'public interest will be well served by [approving the project].'" *Ctr. for Biological Diversity v. Dep't of Interior*, 623 F.3d 633, 647 (9th Cir. 2010).

210. BLM's failure to protect the environment and public interest in issuing the JROD and granting the Ambler Road right-of-way in violation of FLPMA and its implementing regulations is arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA. 5 U.S.C. § 706(2).

### Count IV(B): Failure to Analyze All Impacts Associated with the Right-of-Way Grant

211. Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–208.

212. FLPMA requires that BLM fully analyze and impose conditions that protect not only the land crossed by the right-of-way, but all federal lands and public resources that may be affected by the construction and use of the Ambler Road and its associated infrastructure (including impacts from exploration and mining in the Ambler Mineral District) made possible by BLM's approval of the right-of-way.

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

213.    For the Ambler Road proposal, BLM failed to evaluate all aspects and ramifications of issuing the right-of-way by unreasonably limiting the scope of its analysis. For example, BLM failed to analyze and consider the full impacts from the gravel mines and related supporting infrastructure associated with the grant of the right-of-way, as well as the significant impacts to aquatic, wildlife, and other resources directly, indirectly, or cumulatively resulting from and related to the construction and use of the Ambler Road.

214.    BLM's failure to analyze all impacts associated with issuing the JROD and granting the Ambler Road right-of-way in violation of FLPMA and its implementing regulations is arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA. 5 U.S.C. § 706(2).

### Count IV(C): Failure to Limit the Scope of the Right-of-Way Grant

215.    Plaintiffs re-allege, as if fully set forth here, every allegation contained in paragraphs 1–212.

216.    FLPMA requires that "[e]ach right-of-way shall be limited to the ground which the Secretary concerned determines [] will be occupied by facilities which constitute the project for which the right-of-way is granted, issued, or renewed [and] to be necessary for the operation or maintenance of the project." *Id*. § 1764(a).

_____

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

217. By issuing its authorization for AIDEA's proposal for a 250-foot right-of-way under Alternative A, rather than considering AIDEA's revised permit application provided to the Corps, BLM failed to ensure that its right-of-way grant is limited to the ground necessary for the operation or maintenance of the Ambler Road. 43 U.S.C. § 1764(a). This also violates the requirement for a right-of-way to do no unnecessary damage to the environment (as set out in Count IV(A)).

218. BLM's issuance of the JROD and grant of the Ambler Road right-of-way for more ground than is necessary for operation and maintenance of the project are in violation of FLPMA and its implementing regulations, are arbitrary, capricious, an abuse of discretion, not in accordance with law, without observance of procedure required by law, and in excess of statutory jurisdiction, authority, or limitations, within the meaning of the APA. 5 U.S.C. § 706(2).

## **REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court grant the following relief:

1. Declare that BLM's and the Corps' findings, analysis, conclusions, and decisions contained in the final EIS, JROD, and 404 Permit violated ANILCA, NEPA, the CWA, FLPMA, and the APA; that the Coast Guard's failure to follow the procedures in Title XI of ANILCA or issue a decision in the required timeframe violated ANILCA; that the NPS Decision violates ANILCA; and that all agency actions as set forth above

---

FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF

Page 69 of 70

*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG

are arbitrary, capricious, an abuse of discretion or not in accordance with law and without observance of procedure required by law, are agency actions unlawfully withheld or unreasonably delayed, and that such authorizations are without "any force or effect";

2.      Vacate and set aside as unlawful any and all agency approvals and underlying analysis documents, including but not limited to the final EIS, JROD, 404 Permit, NPS Decision, and any authorizations stemming from these documents;

3.      Enter appropriate injunctive relief, including enjoining the Defendants from allowing, authorizing, or approving any action in reliance on the JROD, 404 Permit, and NPS Decision, until the agencies have complied with the CWA, NEPA, ANILCA, FLPMA, and the implementing regulations and policies of these laws;

4.      Award Plaintiffs all reasonable costs and attorneys' fees as authorized by law; and

5.      Grant such other relief as this Court deems just and proper.

Respectfully submitted this 4th day of August, 2020,


                                         s/ Bridget Psarianos
                                        Bridget Psarianos (AK Bar No. 1705025)
                                        Suzanne Bostrom (AK Bar No. 1011068)
                                        Brian Litmans (AK Bar No. 0111068)
                                        Roger Flynn (*pro hac vice*)

                                        *Attorneys for Plaintiffs*


_____
FIRST AM. COMPL. FOR DECLARATORY AND INJUNCTIVE RELIEF
*N. Alaska Envtl. Ctr., et al. v. Bernhardt, et al.*, Case No. 3:20-cv-00187-SLG