CLYDE "ED" SNIFFEN, JR.
ACTING ATTORNEY GENERAL

J. Anne Nelson (Alaska Bar No. 070523)
Chief Assistant Attorney General
Brian E. Gregg (Alaska Bar No. NA20115)
Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-6617
Facsimile: (907) 276-3697
Email: brian.gregg@alaska.gov
       anne.nelson@alaska.gov

*Attorneys for State of Alaska*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| Northern Alaska Environmental Center, *et al.*,<br><br>  Plaintiffs,<br><br>v.<br><br>David Bernhardt, in his official capacity as Secretary of the Interior, *et al.*,<br><br>  Defendants,<br><br>  and<br><br>Ambler Metals LLC and Alaska Industrial Development and Export Authority,<br><br>  Intervenor-Defendants. | **Case No. 3:20-cv-00187-SLG**<br><br><br><br><br><br><br><br><br><br>**Memorandum In Support of Motion to Intervene by State of Alaska** |

The State of Alaska seeks to intervene in this lawsuit—as a defendant—in order to protect its sovereign interests in the management and development of the State's natural resources, to protect the State's economic interests, and to ensure fulfillment of the statutory mandate in the Alaska National Interest Lands Conservation Act ("ANILCA") to provide access to the Ambler Mining District.

On, August 4, 2020, Plaintiffs filed their original Complaint, followed thereafter by an Amended Complaint on August 13, 2020. ECF Nos. 1 and 9. Ambler Metals, LLC, and the Alaska Industrial Development and Export Authority ("AIDEA") moved to intervene on November 17, 2020. ECF Nos. 17 and 19. This court granted both parties intervenor-defendant status in an order dated November 20, 2020. ECF No. 23.

**BACKGROUND**

The Ambler Mining District ("District") is located in northern Alaska along the southern edge of the Brooks Range and is comprised of a patchwork of federal, state, and privately held lands, many of which are inholdings.[1] The District contains "extensive mineral resources, including copper, silver, gold, lead and zinc" and is "one of the largest undeveloped copper-zinc mineral belts in the world."[2] Although the area has been the subject of mineral exploration for nearly a century, little development has occurred because there is currently no transportation infrastructure in place to facilitate resource

---

[1] http://www.ambleraccess.com/history.html (last accessed Nov. 30, 2020).

[2] http://www.ambleraccess.com/history.html (last accessed Nov. 30, 2020); *see also* Ambler Road Final Environmental Impact Statement (March 2020) ("FEIS") at 3-7.*see also* FEIS App'x H at H-2 to H-5.

*Northern Alaska Environmental Center, et al.*   Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.*   Page 2 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG   Document 30-1   Filed 12/16/20   Page 2 of 20

development.[3] The federal government is now positioned to fulfill its statutory obligation under Section 201(4) of the Alaska National Interest Lands Conservation Act ("ANILCA") to provide access to the Ambler Mining District.[4]

The Alaska Department of Transportation planned a controlled access transportation corridor to the District in 2009, formally titled the Ambler Mining District Industrial Access Project ("Ambler Access Project").[5] The Ambler Access Project will build a 211-mile industrial access road from the Dalton Highway west to the Ambler Mining District.[6] The right-of-way will be roughly 250-feet wide along most stretches, with some minor slope adjustments as needed.[7]

The Ambler Access Project was transferred to the AIDEA in 2013, which served as the project applicant thereafter.[8] Owing to its unique nature and function,[9] AIDEA's role

---

[3] FEIS App'x H at H-2.

[4] Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, § 201(4)(b), 94 Stat. 2371, 2379 (1980) [16 U.S.C. § 410hh] ("Congress finds that there is a need for access for surface transportation purposes across the Western (Kobuk River) unit of the Gates of the Arctic National Preserve (from the Ambler Mining District to the Alaska Pipeline Haul Road) and the Secretary *shall* permit such access in accordance with the provisions of this subsection.") (emphasis added).

[5] FEIS at 1-2.

[6] *Id.* at ES-1.

[7] *Id.* at 3-109, n. 57.

[8] *Id.*, 1-1 to 1-2. Notably, coordination with DNR was necessary because "ANILCA included no such specific provision for access across BLM-managed lands." *Id.* at 1-2; *see also* http://www.amberaccess.com/history.html (last accessed Nov. 30, 2020).

[9] AIDEA is a public corporation whose purpose is "to increase job opportunities and otherwise to encourage the economic growth of the state, including the development of its natural resources, through the establishment and expansion of manufacturing, industrial, energy, export, small business, and business enterprises." A.S. § 44.88.010. To this end, it

*Northern Alaska Environmental Center, et al.*             Case No.: 3:20-cv-00187-SLG
  *v. David Bernhardt, et al.*                                                      Page 3 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG    Document 30-1    Filed 12/16/20    Page 3 of 20

in the Ambler Access Project has been to form "a public-private partnership to finance, construct, operate and maintain the facility."[10]

The Ambler Access Project authorization process formally began in November 2015 when AIDEA filed a Standard Form 299 ("SF299") right-of-way ("ROW") application for industrial grade surface transportation use in and to the District with the Bureau of Land Management ("BLM") and National Park Service ("NPS"), among other entities.[11] BLM accepted the SF299 ROW application in June 2016.[12] The ROW agreement authorizes a 50-year operational life for the access road, after which the road will be reclaimed.[13]

Pursuant to the National Environmental Policy Act ("NEPA"),[14] BLM served as lead agency in preparing an environmental impact statement ("EIS") for the Ambler Access Project. Pursuant to Section 201(4) of ANILCA,[15] NPS was the lead agency (with the U.S.

---

serves as a public-private interface for large scale infrastructure development projects, including mining operations as would occur within the Ambler Mining District. *Id.*; *see generally* http://www.aidea.org/About.aspx (last accessed Nov. 30, 2020).

[10] *Memorandum in Support of AIDEA's Motion to Intervene* (ECF No. 19) at 5 (citing *Declaration of Mark Davis* ¶ 13 (ECF No. 20) ("Davis Decl.")).

[11] *Memorandum in Support of AIDEA's Motion to Intervene* (ECF No. 19) at 5 (citing Davis Decl. ¶¶ 7, 8 (ECF No. 20)). AIDEA submitted a follow-up SF299 application to BLM in April 2019 for communications facilities associated with the proposed access road. *Id.*

[12] FEIS at 1-1.

[13] *Id.* at 2-6, 2-9.

[14] 42 U.S.C. § 4321 *et seq.*

[15] ANILCA, Pub. L. No. 96-487, § 201(4)(c), 94 Stat. 2371, 2379 (1980) [16 U.S.C. § 410hh(4)].

*Northern Alaska Environmental Center, et al.*     Case No.: 3:20-cv-00187-SLG
*v. David Bernhardt, et al.*     Page 4 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG    Document 30-1    Filed 12/16/20    Page 4 of 20

Department of Transportation) in preparing the Environmental and Economic Analysis ("EEA") "in lieu of" a separate NEPA document for the road corridor though Gates of the Arctic National Park. Scoping for both the EIS and EEA closed in January 2018.[16] A draft EIS was issued in August 2019 and a Final EIS ("FEIS") was issued in March 2020.[17] A Joint Record of Decision ("ROD") was issued in July 2020. The EEA decision document also was issued in July 2020.

The State of Alaska has been a cooperating agency with BLM and NPS throughout the NEPA and EEA processes.[18] This reflects both the general duty of the State of Alaska to foster the responsible development of the State's abundant mineral resources per the Alaska Constitution[19] and the Alaska Statehood Act,[20] as well as the specific duty of the Alaska Department of Natural Resources (DNR) to "administer the state program for the conservation and development of natural resources, including . . . land, water, . . . and

---

[16] FEIS at 1-6.

[17] *Id.* at ES-1.

[18] *Id.* at ES-1, 1-4. At the local government level, the Northwest Arctic Borough is also a cooperating agency. *Id.*

[19] Alaska Const. Art. VIII, §§ 1 and 2.

[20] Alaska Statehood Act, Pub. L. No. 85-508, 72 Stat. 339 (1958). Section 6(a) and (b) granted the State of Alaska the authority to select certain public lands then administered by the federal government for transferal to State ownership. Section 6(i) further provides: "[a]ll grants made or confirmed under this Act shall include mineral deposits. The grants of mineral lands to the State of Alaska under subsections (a) and (b) of this section are made upon the express condition that all sales, grants, deeds, or patents for any of the mineral lands so granted shall be subject to and contain reservation to the State of all of the minerals in the lands so sold, granted, deeded, or patented, together with the right to prospect for, mine, and remove the same. Mineral deposits in such lands shall be subject to lease by the State as the State legislature may direct."

*Northern Alaska Environmental Center, et al.*      Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.*      Page 5 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG   Document 30-1   Filed 12/16/20   Page 5 of 20

minerals."[21] The Ambler Access Project is vital to the State's economic and social development.

The Ambler Access Project has the potential to generate enormous financial benefits for the State and local governments. According to the FEIS, over the life of the various mines in the District, such revenues include (but are not limited to) the following sources:

- $13 million in claim rents to the State;
- $393 million in mining license tax revenues to the State;
- $524 million in corporate income taxes to the State;
- $214 million in production royalties to the State;
- $1.6 million in fuel tax to the State;
- $193 million in payments to local governments.[22]

Moreover, the construction of the Ambler Industrial Access Road is estimated to create an annual average of 360 direct jobs during road construction and up to 81 annual jobs for road operations and maintenance over the life of the road.[23] The economic benefits that will stem from construction of the road and development of known projects in the Ambler Mining District is estimated to be 2,777 direct jobs with approximately $286 million in wages annually as well as an additional 2,034 indirect and induced jobs with approximately $108 million in wages annually.[24] Development and operation of future mines is estimated to create 495 direct jobs with approximately $72 million in wages annually as well as an

---

[21] A.S. 44.37.020(a).

[22] FEIS, App'x H at H-76 to H-77 (Tables 3-7 and 3-8).

[23] U. of Alaska Ctr. for Econ. Dev., *Economic Impacts of Ambler Mining District Industrial Access Project and Mine Development*, 4 (U. of Alaska 2019) ("*AMDIAP Economic Impact Analysis*").

[24] FEIS, App'x H at H-74 (Table 3-4).

*Northern Alaska Environmental Center, et al.*  Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.* Page 6 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG   Document 30-1   Filed 12/16/20   Page 6 of 20

additional 3,436 indirect and induced jobs with approximately $228 million in wages annually.[25]

In addition to economic benefit, the State of Alaska is obligated to advance its property rights and sovereign regulatory interests. Over 1,300 mining claims exist within the vicinity of the Ambler Mining District.[26] Several major mining companies alone have staked over 160,000 acres of claims in the District.[27] The total mineral potential in the area is estimated at 221.9 million tons of ore.[28] DNR is responsible for the processing, permitting, and administration (including reclamation) of current and future mining claims covering this enormous quantity of minerals.[29] The State will be administering the claims on state land pursuant to state law, fulfilling its obligations to develop its natural resources for the economic and social benefit of its citizens as required by the Alaska Statehood Act and the Alaska Constitution.

## ARGUMENT

### A. The State is entitled to intervene as a matter of right.

The State is entitled to mandatory intervention in order to fulfill its statutory and constitutional duty to provide access to the Ambler Mining District and protect its broader interest in the proper stewardship of Alaska's natural resources. Pursuant to Federal Rule

---

[25] *Id.* at H-74 to H-75 (Table 3-5).

[26] FEIS, 1-2; *see also* FEIS, Map 3-25 (general location of mining claims in the Ambler Mining District).

[27] FEIS, App'x H at H-3.

[28] *Id*.

[29] *See generally* A.S. § 38.05.185 *et seq.*

*Northern Alaska Environmental Center, et al.*     Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.*     Page 7 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG    Document 30-1    Filed 12/16/20    Page 7 of 20

of Civil Procedure 24(a)(2), a court must permit intervention as a matter of right by anyone who "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." This rule is liberally construed in favor of potential intervenors.[30] A court's evaluation is guided primarily by "practical and equitable considerations,"[31] and a court must accept as true the non-conclusory allegations made in support of an intervention motion.[32]

The Ninth Circuit has a four-part test for intervention as of right: (1) the motion must be timely; (2) the applicant must claim a "significantly protectable interest" relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede its ability to protect that interest; and (4) the applicant's interest must not be adequately

---

[30] *Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1180 (9th Cir. 2011) ("A putative intervenor will generally demonstrate a sufficient interest for intervention of right in a NEPA action, as in all cases, if it will suffer a practical impairment of its interests as a result of the pending litigation." (internal citations omitted)).

[31] *Id.* at 1179 (quoting *United States v. City of Los Angeles*, 288 F.3d 391, 397–398 (9th Cir. 2002) ("[a] liberal policy in favor of intervention serves both efficient resolution of issues and broad access to courts")); *see also Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 818 (9th Cir. 2001).

[32] *Sw. Ctr. For Biological Diversity*, 268 F.3d at 819 (citing *Reich v. ABC/York- Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995)).

*Northern Alaska Environmental Center, et al.*     Case No.: 3:20-cv-00187-SLG
*v. David Bernhardt, et al.*     Page 8 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG Document 30-1 Filed 12/16/20 Page 8 of 20

represented by the parties to the action.[33]  Here, the State meets all four elements of this test.

### 1. The State's Motion is Timely.

The State's motion satisfies the first element of the Rule 24(a) analysis because it is timely. Timeliness is dependent on the stage of the proceedings, potential prejudice to the parties, and the reason for any delay.[34] Prejudice to existing parties is the most important timeliness consideration.[35]

Here, the Amended Complaint was filed on August 13, 2020. ECF No. 9. The only significant procedural development since then has been the issuance of the November 20, 2020 Order granting the motions to intervene filed by AIDEA and Ambler Metals, LLC. ECF No. 23.  The Federal Defendants submitted their Answer (ECF No. 11) on October 13, 2020. The administrative record has not yet been filed.  Indeed, on December 14, 2020, the Defendants filed an unopposed motion to move the filing deadline for the administrative record to January 15, 2021. ECF No. 27. As the State's motion to intervene follows on the heels of the other motions, and no dispositive motions have been filed, there will be no prejudice to the parties at this early stage of the litigation. Furthermore, the State accepts the current procedural posture of the case.

---

[33] *Wilderness Soc'y*, 630 F.3d at 1177 (citing *Sierra Club v. Envtl. Prot. Agency*, 995 F.2d 1478, 1481 (9th Cir. 1993)).

[34] *Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317, 1319 (9th Cir. 1997).

[35] *United States v. Oregon*, 745 F.2d 550, 552 (9th Cir. 1984).

*Northern Alaska Environmental Center, et al.*　　　　　　　　　　Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.*　　　　　　　　　　　　　　　　　　　　Page 9 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG   Document 30-1   Filed 12/16/20   Page 9 of 20

### 2. The State claims a significantly protectable interest in this action.

Alaska has several significant protectable interests in this action. To intervene as of right, an applicant need not establish standing or even show a particularized injury of the type used to establish standing.[36] No specific legal or equitable interest need be established.[37] An applicant need only demonstrate a "significantly protectable interest."[38]

A proposed intervenor will "generally demonstrate a sufficient interest" if "it will suffer a practical impairment of its interests as a result of the pending litigation."[39] The Ninth Circuit applies this broad interest criterion to involve "as many apparently concerned persons as is compatible with efficiency and due process."[40] It is generally enough that the interest asserted is protectable under some law and that there is a relationship between the protected interest and the claims at issue.[41]

As set forth below, the State's interests satisfy the second element of the intervention analysis because it has both a direct economic interest and a regulatory interest in the instant dispute.

---

[36]    *Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332, 1340 (9th Cir 1992).

[37]    *Wilderness Soc'y*, 630 F.3d at 1179.

[38]    *Id.* (citing *California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006) and *Sierra Club*, 995 F.2d at 1481, 1484 (*abrogated by Wilderness Soc'y*, 630 F.3d at 1177–1180 (a court cannot categorically prohibit intervention-of-right on meritorious NEPA claims))).

[39]    *Wilderness Soc'y*, 630 F.3d at 1180 (internal citations omitted).

[40]    *County of Fresno v. Andrus,* 622 F.2d 436, 438 (9th Cir. 1980) (internal citations omitted).

[41]    *Sw. Ctr. for Biological Diversity*, 268 F.3d at 818.

*Northern Alaska Environmental Center, et al.*    Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.*    Page 10 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG   Document 50-1   Filed 12/16/20   Page 10 of 20

### a. The State has significant economic interests related to this case.

Enabling development of the Ambler Mining District is crucial to the financial well-being of Alaska both presently and in the coming years. The State will receive royalties, mineral license taxes, and corporate income taxes on minerals produced from the state-owned land, including the extensive deposits of gold, silver, copper, zinc, and other minerals located within the Ambler Mining District. Specifically, the FEIS estimates that the State will generate approximately $214 million in production royalties, $393 million in mining license tax revenues, $524 million in corporate income taxes on top of $13 million in claim rents and $1.6 million in fuel tax—a total estimated sum of $1.145 billion.[42] Additionally, the FEIS estimates that local governments and communities stand to receive approximately $193 million in payments to village improvement funds and payments in lieu of taxes.[43]

The Ambler Access Project itself also will be a major source of short- and long-term employment. The initial road construction period will generate an annual average of 360 direct jobs and up to 81 direct annual jobs for road operations and maintenance over the life of the road.[44] The mining activities throughout the Ambler Mining District are estimated to create 2,777 direct jobs with approximately $286 million in wages annually as well as an additional 2,034 indirect and induced jobs with approximately $108 million

---

[42] FEIS, App'x H at H-76 to H-77 (Table 3-7).

[43] *Id.* at H-76 to H-77 (Table 3-8).

[44] *AMDIAP Economic Impact Analysis* at 4; *see also* FEIS, App'x H at H-99.

*Northern Alaska Environmental Center, et al.*  Case No.: 3:20-cv-00187-SLG
  *v. David Bernhardt, et al.*  Page 11 of 20
Memorandum ISO State of Alaska's Motion to Intervene
Case 3:20-cv-00187-SLG   Document 30-1   Filed 12/16/20   Page 11 of 20

in wages annually.[45] Finally, the mining operations themselves are estimated to create 495 direct jobs with approximately $72 million in wages annually as well as an additional 3,436 indirect and induced jobs with approximately $228 million in wages annually.[46] This is in addition to the social and economic benefits of making State land accessible for natural resource development, which is a foundational principle of Article VIII of Alaska's Constitution. The economic impacts are substantial, particularly in the setting of remote, rural north-central Alaska where the Ambler Mining District is located.

In the broader context, the Ambler Access Project would add a significant benefit to Alaska's economy. The Alaska Division of Geological & Geophysical Surveys valued Alaska's mineral industry in 2018 at $2.90 billion. "The total value for 2018 is a composite of the year's expenditures on exploration and development, plus the revenue to the operators from the commodities produced. Exploration and development expenditures continued to rebound from the lows of a few years ago, with increases of 16 and 12 percent, respectively."[47] "Wages for mining-sector jobs, averaging $112,857 in 2018, were some of the highest among major industries in Alaska and were more than twice the average private-sector wage of $54,192 per year."[48] In 2018, "Alaska's mining industry provided

---

[45] FEIS, App'x H at H-74 (Table 3-4).

[46] FEIS, App'x H at H-74 to H-75 (Table 3-5).

[47] Alaska Dep't of Natural Res. Geological & Geophysical Surveys, "Alaska's Mineral Industry Stats," *available at* https://dggs.alaska.gov/pubs/minerals (last accessed Nov. 30, 2020).

[48] Alaska Dep't of Natural Res. Geological & Geophysical Surveys, Alaska's Mineral Industry 2018 (Special Report 74), 5 (2018), *available at* http://dggs.alaska.gov/webpubs/dggs/sr/text/sr074.pdf (last accessed Nov. 30, 2020).

*Northern Alaska Environmental Center, et al.*  Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.*  Page 12 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG   Document 30-1   Filed 12/16/20   Page 12 of 20

4,500 direct mining jobs and an additional 4,700 indirect jobs. Direct and indirect wages totaled an estimated $715 million."[49] Thus, the comparative impact of the Ambler Mining District's economic potential demonstrates a remarkable source of revenue for the State.

Should the Plaintiffs' requested relief be granted, it would overturn every decision rendered by the Defendant agencies, essentially scuttling the Ambler Access Project. *See* Am. Compl. at 70 (ECF No. 9). This would strand State resources and immediately chill investment and development opportunities—along with potential job creation and state and local revenues.[50]

### b. The State's interests as a sovereign, landowner, and regulatory body.

The State has strong sovereign interests in this dispute, being tasked with responsibly managing Alaska's natural resources to provide for the economic, social, and cultural needs of its citizens. The State also has strong proprietary interests stemming from its responsibility for the conservation, management, and profitable development of its land and resources.

Under the Alaska Statehood Act, Congress authorized the State to select lands for its own use.[51] The State gained all right and title to the selected lands, including mineral deposits on those lands. The Statehood Act and legislative history reflect that Congress

---

[49] *Id.* at 6.

[50] *See Scotts Valley Bank of Pomo Indians of the Sugar Bowl Rancheria v. United States*, 921 F.2d 924, 928 (9th Cir. 1990) ("[a]llowing the City to intervene in this action is the only practical means of protecting its taxing and regulatory interest").

[51] Alaska Statehood Act, Pub. L. No. 85-508, §6(a)-(b), 72 Stat. 339 (1958).

*Northern Alaska Environmental Center, et al.*   Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.*   Page 13 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG   Document 30-1   Filed 12/16/20   Page 13 of 20

expected the State to manage its land entitlement of over 100 million acres to serve Alaska's overall economic and social well-being, and recognized that the mineral estate was particularly important: Section 6(i) of the Alaska Statehood Act requires the State to retain the mineral interest in its statehood entitlement land, lest the land be subject to forfeit to the United States.[52]

As the Senate Committee on Interior and Insular Affairs stated in its report on the Statehood Act, it "felt obligated to broaden the right of selection so as to give the State at least an opportunity to select lands containing real values, instead of millions of acres of barren tundra. To attain this result, the State is given the right to select lands known or believed to be mineral in character."[53] The Ninth Circuit has recognized that the land grants Congress made under the Alaska Statehood Act allowed the State to select land that provided for the State's "overall economic and social well- being," and that these land selections would include mineral deposits.[54]

Furthermore, the Alaska Constitution imposes a duty on the State to responsibly manage and develop Alaska's natural resources to the maximum use consistent with the public interest and for the maximum benefit of its people.[55] It is "the policy of the state to conserve, improve, and protect its natural resources and environment and control water,

---

[52] *Id.* § 6(i), 72 Stat. at 340.

[53] S. Rep. No. 1028, 83rd Cong. 2d Sess., at 6 (1954).

[54] *Udall v. Kalerak*, 396 F.2d 746 (9th Cir. 1968). *See also United States v. Atlantic Richfield Co.* 435 F. Supp. 1009, 1016 (D. Alaska 1977), *aff'd* 612 F.2d 1132 (9th Cir.) (Congress' intent in Section 6 of the Statehood Act was to provide the State with a solid economic foundation).

[55] Alaska Const. Art. VIII, §§ 1 and 2.

*Northern Alaska Environmental Center, et al.* Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.* Page 14 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG   Document 50-1   Filed 12/16/20   Page 14 of 20

land, and air pollution, in order to enhance the health, safety, and welfare of the people of the state and their overall economic and social well-being."[56] It is also "the policy of the state to encourage the settlement of its land and the development of its resources by making them available for maximum use consistent with the public interest."[57] Consequently, state law mandates that DNR "administer the state program for the conservation and development of natural resources, including . . . land, water, . . . and minerals."[58] ANILCA also recognizes the importance to the State of being able to access its resources.[59] Therefore, just as the State's collaboration with BLM and other federal agencies was necessary at the administrative level, so is the State's presence in this litigation likewise necessary.

### 3. Absent intervention, disposition of this dispute would impair and impede the State's ability to protect its interests.

For the above reasons, the State also satisfies the third criterion for intervention as of right because this action's disposition, as a practical matter, may impair or impede the State's ability to protect its asserted interests.[60] The question of impairment is not separate from the question of existence of an interest.[61] In reviewing this criterion, the courts look

---

[56] AS § 46.03.010(a).

[57] AS § 38.05.910; *see also* Alaska Const. art. VIII, § 5 ("The legislature may provide for facilities, improvements, and services to assure greater utilization, development, reclamation, and settlement of lands . . ..").

[58] AS § 44.37.020(a).

[59] 16 U.S.C. § 410hh(4).

[60] *Wilderness Soc'y*, 630 F.3d at 1177.

[61] *See, e.g.*, *Natural Res. Def. Council, Inc. v. U.S. Nuclear Regulatory Comm'n*, 578 F.2d 1341, 1345 (10th Cir. 1978).

*Northern Alaska Environmental Center, et al.* Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.* Page 15 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG   Document 30-1   Filed 12/16/20   Page 15 of 20

to the "'practical consequences' of denying intervention, even where the possibility of future challenge to the regulation remain[s] available."[62]

Granting the Plaintiffs' requested relief would directly impair the State's ability to protect its sovereign and proprietary interests in accessing and developing its natural resources. Setting aside the ROD and EEA would require the State to start over, resulting in extraordinary expense and delay in developing access—access mandated by federal statute—to known state-owned mineral resources. Beyond this, principles of res judicata, claim preclusion, *stare decisis*, and related doctrines may constrain the State's ability to challenge future federal actions that present issues involving the limits of federal authority.[63] Participating as an intervenor mitigates that risk by permitting the State to present and litigate issues specific to its interests.

### 4. The State's interests are not adequately represented by the other parties.

The State also satisfies the final criterion for intervention, which asks whether the representation of the State's interests by existing parties "may be" inadequate. The burden to show inadequacy is minimal.[64] In assessing the adequacy of representation, courts

---

[62] *Natural Res. Def. Council v. Costle*, 561 F.2d 904, 909 (D.C. Cir. 1977).

[63] *United States ex rel. McGough v. Covington Techs. Co.*, 967 F.2d 1391, 1396 (9th Cir. 1992) ("[T]he government's claims could be impaired if the doctrine of stare decisis were applied."); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003) (disposition of lawsuit would impair intervenor's ability to protect its interests regardless of whether intervenor could reverse unfavorable ruling by bringing a separate lawsuit; noting that "[t]here is no question that the task of reestablishing the status quo if [plaintiffs] succeed[] in this case will be difficult and burdensome.").

[64] *Sw. Ctr. for Biological Diversity,* 268 F.3d at 823.

*Northern Alaska Environmental Center, et al.*     Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.*     Page 16 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG   Document 30-1   Filed 12/16/20   Page 16 of 20

consider: (1) whether the present parties' interests are such that they will undoubtedly make all the intervenor's arguments; (2) whether the present parties are capable of and willing to make those arguments; and (3) whether the would-be intervenor would offer any necessary elements to the proceedings that other parties would neglect.[65] The court's inquiry focuses on the subject of the action, not just the particular issues before the court at the time of the motion.[66] Although a presumption of adequacy of representation may arise when an existing party shares the exact same objective as a would-be intervenor,[67] it is likewise true that when a would-be intervenor's interest "is similar to, but not identical with, that of one of the [existing] parties," the applicant should be allowed to intervene.[68] Therefore, as a general principle, any doubt regarding the adequacy of representation should be resolved in favor of the would-be intervenor.[69]

Here, the other parties will not adequately represent the State's interests because it is axiomatic that only the State can advocate on behalf of its own sovereign and proprietary interests. Ambler Metals, LLC, of course, is a private party and its interests are limited to its individual motivations. While the Federal Defendants are cooperating with the State to enable the approval and construction of the Ambler Access Project, the Federal Defendants' interests are peculiar to each individual agency, such as the administration of

---

[65] *Sw. Ctr. for Biological Diversity,* 268 F.3d at 822.

[66] *Id.* at 823.

[67] *Sw. Ctr. for Biological Diversity,* 268 F.3d at 823.

[68] 6 Moore's Federal Practice § 24.03[4][a][i] at 24-42; Wright & Miller, § 1909 at 319.

[69] *Id.* at 346.

*Northern Alaska Environmental Center, et al.*                 Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.*                                                       Page 17 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG    Document 30-1    Filed 12/16/20    Page 17 of 20

BLM's portion of the public lands or NPS's management of the National Park System. The same is true with AIDEA—although it is a public corporation, meaning it is owned by the State, AIDEA is not synonymous with the State and has a smaller scope of interests.[70] The State has broader concerns regarding the NEPA and ANILCA Title XI precedent that could be set by this litigation. In contrast, as the project proponent and financing entity, AIDEA's interests are more focused on approval of this particular project. Moreover, AIDEA serves the more focused purpose of providing a public-private interface for large-scale development projects and does not concern itself with the administration of mining claims, transport corridors, or the day-to-day realities of state land and natural resource management, all of which are directly implicated here and are matters that only the State of Alaska can effectively advocate.

### B. The State is also entitled to permissive intervention.

Alternatively, if this Court finds that the State is not entitled to intervention as a matter of right, the State requests permissive intervention under Federal Rule of Civil Procedure 24(b)(2). Upon timely filing of a motion, a court may permit a party to intervene who "has a claim or defense that shares with the main action a common question of law or fact" after considering whether "intervention will unduly delay or prejudice the adjudication of the rights of the original parties."[71] The Ninth Circuit applies a three-prong

---

[70] Indeed, AIDEA itself stated in its motion to intervene that, "while AIDEA may be a public corporation owned by the State of Alaska, in the context of this case the shoes it stands in are *no different from those of a private party* benefiting from government approvals." ECF 19 at 19 (emphasis added).

[71] Fed. R. Civ. P. 24 (b)(1)(B), (b)(3).

*Northern Alaska Environmental Center, et al.*                          Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.*                                                                                       Page 18 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG    Document 50-1    Filed 12/16/20    Page 18 of 20

test to determine if permissive intervention is appropriate: "(1) the movant must show an independent ground for jurisdiction; (2) the motion must be timely; and (3) the movant's claim or defense and the main action must have a question of law and fact in common."[72] Common questions of law and fact exist where an intervenor asserts (a) an interest in the lands and property subject to the government decision-making, (b) defenses of the government's decision-making that are directly responsive to a claim for an injunction, or (c) defenses of the government's decision-making "that squarely respond to the challenges made by plaintiff in the main action."[73]

Here, the State has already shown that its motion is timely, and jurisdiction is clear given that the State owns the majority of land to be traversed by the road, and that the Ambler Mining District is comprised largely of state land. On top of this, the Federal Defendants' defense of the EEA, FEIS, and ROD will directly implicate the State's participation in the NEPA process and related administrative developments; indeed, much of the Federal Defendants' NEPA analysis depended upon scientific data and conclusions provided by DNR, the University of Alaska, and other State entities. Finally, the State's duty to process mining claims, administer mining operations, and provide road access to the Ambler Mining District per ANICLA are all directly impacted by the declaratory and injunctive relief sought here.

---

[72] *Venegas v. Skaggs*, 867 F.2d 527, 529 (9th Cir. 1989) *aff'd sub nom. Venegas v. Mitchell*, 495 U.S. 82 (1990) (citations omitted).

[73] *Kootenai Tribe of Idaho v. Veneman*, 313 F.3d 1094, 1110–11 (9th Cir. 2002).

*Northern Alaska Environmental Center, et al.*  Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.*  Page 19 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG   Document 30-1   Filed 12/16/20   Page 19 of 20

# CONCLUSION

For all the foregoing reasons, the State of Alaska respectfully requests that the Court grant it leave to intervene in this case as a matter of right. Alternatively, at a minimum, the Court should exercise its discretion and allow the State permissive intervention.

DATED: December 16, 2020.

                              CLYDE "ED" SNIFFEN, JR.
                              ACTING ATTORNEY GENERAL

By:   /s/ J. Anne Nelson
       J. Anne Nelson (Alaska Bar No. 070523)
       Chief Assistant Attorney General
       Email: anne.nelson@alaska.gov

       /s/ Brian E. Gregg
       Brian E. Gregg (Alaska Bar No. NA20115)
       Assistant Attorney General
       Department of Law
       1031 West Fourth Avenue, Ste. 200
       Anchorage, AK 99501
       Phone: (907) 269-
       Facsimile: (907) 276-3697
       Email: brian.gregg@alaska.gov

*Attorneys for State of Alaska*

*Northern Alaska Environmental Center, et al.*            Case No.: 3:20-cv-00187-SLG
 *v. David Bernhardt, et al.*                                           Page 20 of 20
Memorandum ISO State of Alaska's Motion to Intervene

Case 3:20-cv-00187-SLG   Document 30-1   Filed 12/16/20   Page 20 of 20