James E. Torgerson (Bar No. 8509120)
Connor R. Smith (Bar No. 1905046)
STOEL RIVES LLP
510 L Street, Suite 500
Anchorage, AK 99501
Telephone: 907.277.1900
Facsimile: 907.277.1920
jim.torgerson@stoel.com
connor.smith@stoel.com

Beth S. Ginsberg (Pro Hac Vice Pending)
James C. Feldman (Bar No. 1702003)
STOEL RIVES LLP
600 University Street, Suite 3600
Seattle, WA 98101
Telephone: 206.624.0900
Facsimile: 206.386.7500
beth.ginsberg@stoel.com
james.feldman@stoel.com

Attorneys for Proposed Intervenor-Defendant
NANA Regional Corporation, Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| NORTHERN ALASKA ENVIRONMENTAL CENTER, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DEBRA HAALAND, in her official capacity as Secretary of the Interior, *et al.*, <br><br> Defendants, <br><br> and <br><br> AMBLER METALS LLC, *et al.*, <br><br> Intervenor-Defendants. | Case No.: 3:20-cv-00187-SLG |

**NANA REGIONAL CORPORATION, INC.'S UNOPPOSED
MOTION TO INTERVENE AND MEMORANDUM IN SUPPORT**

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG          1

# I. INTRODUCTION

As the private, indigenous owner of over 2.2 million acres of land held in fee simple title in the Northwest Arctic Borough (also referred to as the "NANA Region"), proposed Defendant-Intervenor NANA Regional Corporation, Inc. (NANA) is the only indigenous landowner in the area affected by the Ambler Access Project within the NANA Region. It has a unique interest in and perspective on simultaneously pursuing economic development in its region while prioritizing access to subsistence and cultural resources on behalf of its shareholders.[1] NANA holds distinct, protectable interests that relate directly to the property and transaction that are the subject of this action.

NANA seeks to intervene to protect its interests in managing its lands for subsistence, developing its natural resources, protecting its economic interests for the benefit of its Iñupiat shareholders, and preserving the statutory mandate in the Alaska National Interest Lands Conservation Act (ANILCA) to provide surface transportation access linking the Ambler Mining District and the Dalton Highway. NANA is so situated that disposing of this action may as a practical matter impair or impede its ability to protect those interests. NANA therefore respectfully asks that the Court grant its motion to intervene as of right under Fed. R. Civ. P. 24(a). Alternatively, NANA asks the Court to grant permissive intervention under Fed. R. Civ. P. 24(b).

---

[1] Ex. A, Declaration of William Monet dated May 17, 2021 (Monet Decl.) ¶ 2.
*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG        2

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

This motion is supported by the Declarations of NANA Interim President and CEO William Monet and NANA Vice President of Lands Elizabeth Cravalho, which are filed concurrently with this motion.[2] NANA also has lodged a proposed Answer concurrently with this motion, and a proposed order.[3] If allowed to intervene, NANA will coordinate with Defendants and the other Defendant-Intervenors to avoid duplicative arguments.

Undersigned counsel has conferred with counsel for Plaintiffs, Defendants, and Defendant-Intervenors. Plaintiffs have indicated they do not oppose this motion subject to certain conditions to which NANA has agreed and which are contained in the parties' stipulation filed on or about the same date as this motion. Federal Defendants take no position on the motion, and all Defendant-Intervenors have indicated they do not object to NANA's intervention.

## II. BACKGROUND

### A. NANA has a unique responsibility to act for the benefit of its Iñupiat shareholders, both socially and economically.

NANA has a unique responsibility to simultaneously pursue economic development in its region and preserve access to subsistence and cultural resources for its shareholders.[4] NANA was organized under the Alaska Native Claims Settlement Act of 1971 (ANCSA).[5] While settling Alaska Native land claims was the catalyst for ANCSA, the Act's history

---

[2] *Id.*; Ex. B, Declaration of Elizabeth Cravalho dated May 14, 2021 (Cravalho Decl.).
[3] Proposed Defendant-Intervenor's Proposed Answer; Proposed Order.
[4] Monet Decl. ¶ 2.
[5] Cravalho Decl. ¶ 3.

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG          3

reveals that the issue of Alaska Native self-determination was central to its development.[6] For over two centuries, the policy of the federal government towards American Indian and Alaska Native people has evolved.[7] The United States worked first to terminate Tribes and then to assimilate the country's indigenous peoples.[8] More recently, it adopted a policy of self-determination.[9]

ANCSA was passed during the Self-Determination Era—a time when the federal government viewed the reservation system of the American Indian tribes in the Lower-48 as a failed system and when Native American communities sought greater control over and a more substantial role in the programs serving their communities.[10] In constructing ANCSA, Congress was not interested in replicating the reservation system in Alaska. Instead it settled Native land claims through the creation of over 200 Alaska Native village corporations and 13 Alaska Native regional corporations, comprised of Alaska Native shareholders from the respective villages and regions.[11]

Alaska Native Corporations (ANCs) like NANA have a unique responsibility to act for the benefit of their shareholders both socially and economically.[12] NANA's lands

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

---

[6] *Id.*

[7] *Id.*

[8] *Id.*

[9] *Id.* at ¶¶ 3–4.

[10] *Id.* at ¶ 4.

[11] *Id.* Shares in Native corporations, including NANA, may not be sold or traded. They have no publicly traded stock. *See* Pub. L. 100-241, 1988.

[12] Monet Decl. ¶ 2. 43 U.S.C. § 1601(b) of the Alaska Native Claims Settlement Act.

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG                4

represent cultural and economic assets that are critically important to the perpetuation of the cultures of its shareholders who have inhabited the land from time immemorial.[13] NANA itself is a tool of the Iñupiat people of the region to achieve greater self-determination, to create institutions that reflect their values, and to contribute to the economic and social well-being of their communities.[14] NANA's early leaders recognized the need to secure subsistence and land rights for perpetuity while at the same time responsibly developing NANA's lands to ensure current and future generations have opportunities for employment, income, training and education.[15] They selected lands with subsistence in mind first and resource development opportunities second.[16] Decisions about the Ambler Road Project and the disposition of this case have the potential to substantially affect NANA's ability to maximize the utility of its lands for these purposes.

In addition, NANA's early leaders supported the creation of the Northwest Arctic Borough and a Board of Education to which resource development income could be directed, to ensure that revenues from development in the NANA Region would benefit the region.[17] Through these steps, NANA leaders sought to secure economic self-determination for the NANA Region through responsible development of NANA's lands.[18]

---

[13] Cravalho Decl. ¶ 5.
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG          5

**STOEL RIVES** LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

NANA's ability to responsibly develop its lands is intrinsically linked to access to those lands.[19] Because a decision in this litigation regarding the agency approvals in question has the potential to limit or eliminate the ability of NANA to access its lands, disposing of the litigation may as a practical matter impair or impede NANA's ability to protect its interests. An adverse outcome in this litigation could fundamentally impede NANA's ability to consider and potentially pursue responsible development of its lands for the benefit of future generations.[20]

**B.    From the initial selection of its lands to its active role in management and development of its lands today, NANA's approach has focused first on subsistence and second on responsible resource development.**

NANA's unique mission is to improve the quality of life for its people by maximizing economic growth, protecting and enhancing its lands, and promoting healthy communities through decisions, actions, and behaviors inspired by its Iñupiat Ilitqusiat values and consistent with its core principles.[21] During the ANCSA settlement process, NANA retained approximately 2.2 million acres of traditional land on behalf of the Iñupiat people of Northwest Alaska, and NANA holds this land in fee simple title as a private landowner.[22] In June 1972, NANA established a Land Selection Committee (Committee).[23] This Committee met with communities throughout Northwest Alaska and

---

[19] *Id.*
[20] *Id.*
[21] *Id.* at ¶ 2.
[22] Monet Decl. ¶ 3.
[23] Cravalho Decl. ¶ 6.

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG                6

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

determined, through community input, what lands to prioritize in the selection process.[24] Subsistence was established as the highest priority in the selection process, with oil, gas, and mineral resources ranked as secondary considerations.[25]

In April 1976, NANA merged with 10 of the 11 village corporations in its region.[26] Following this merger, NANA became responsible for land management of both the surface and subsurface estates of its lands, and the reconveyance of lands for public use for the lands held by the 10 villages that merged with NANA.[27]

Today, NANA has nearly 15,000 shareholders who are the descendants of the Iñupiat people of Northwest Alaska.[28] NANA, like other ANCs, is responsible for managing its shareholders' common interests in indigenous owned lands, while the tribes provide governance to the indigenous people.[29]

NANA's policies state that the highest and best use of NANA's lands is subsistence and that management and pursuit of economic development must be done in such a way as to minimize or eliminate impacts to subsistence resources.[30] NANA protects its lands and

---

[24] *Id.*
[25] *Id.*
[26] Monet Decl. ¶ 3. The eleven (11) communities in the NANA Region include Ambler, Buckland, Deering, Kiana, Kivalina, Kobuk, Kotzebue, Noatak, Noorvik, Selawik, and Shungnak. *Id.* The only village corporation with which NANA did not merge is Kikiktagruk Inupiat Corporation (KIC), the village corporation for Kotzebue. *Id.*
[27] *Id.*
[28] *Id.*
[29] Cravalho Decl. ¶ 7.
[30] Monet Decl. ¶ 4.

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG          7

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

the subsistence and cultural resources on them through three mechanisms: (1) exercising site control and access through leases, easements, and permits; (2) utilizing a Trespass Program to patrol lands and report subsistence violations to the State of Alaska; and (3) advocating for subsistence and land rights matters with state, federal, and international governing bodies.[31]

## C. For over 40 years, NANA has coordinated with those pursuing development of the natural resources on its lands, ensuring that any development is done responsibly and for the benefit of its shareholders.

NANA's responsibility to simultaneously pursue economic development while giving priority to subsistence and cultural resources has required that NANA have a seat at the table when its lands and resources are at issue.[32] Intervention in this case would enable NANA to fulfill this paramount objective on behalf of its shareholders.

Relying on unique Iñupiat Traditional Knowledge, NANA has worked to protect its lands and subsistence through agreements with mineral resource development corporations that have pursued natural resource development on NANA lands.[33] Both the Red Dog Operations and the Upper Kobuk Minerals Project agreements establish subsistence committees that advise and guide operations to minimize impacts to subsistence and the environment at all stages of the projects.[34]

---

[31] Cravalho Decl. ¶ 8.
[32] Monet Decl. ¶ 4.
[33] Cravalho Decl. ¶ 9.
[34] *Id.*

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG                    8

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

For example, NANA has partnered for over 40 years with the operator, now Teck Alaska Incorporated (Teck), at the Red Dog Mine located about 90 miles north of the Arctic Circle.[35] NANA owns the mineral resources and Teck operates the mine and mill.[36] Throughout its operational life, the Mine has benefitted NANA's shareholders, the Northwest Arctic Borough, other ANCs, and the State of Alaska.[37] As stated above, the Mine operates under a unique agreement between NANA and Teck that established a subsistence committee to advise on the development and operations of the Mine to minimize its impacts to subsistence resources.[38] The Red Dog Mine subsistence committee consists of Elders and hunters from the villages of Noatak and Kivalina. It meets regularly with Red Dog Mine representatives to review subsistence and environmental issues and provide guidance.[39] To minimize possible effects on sea mammal hunts, shipping schedules are adjusted.[40] To protect caribou herds, their migrations are monitored and haul road traffic is regulated.[41] These are just a few examples of the group's work, only possible because NANA has been part of the conversation about how its lands and resources are developed.

---

[35] Monet Decl. ¶ 5.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

[40] *Id.*

[41] *Id.*

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG                9

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

As an illustration of the importance of the access at issue in this litigation, Teck is able to transport zinc and lead concentrate from Red Dog to market because it has the use of the Delong Mountain Transportation System (DMTS). The DMTS includes a 52-mile road from the Mine to the Red Dog Port on the coast of the Chukchi Sea 16 miles southeast of Kivalina, Alaska.[42] Operations at the Port include working with local communities to determine the start of the shipping season to minimize impacts to whaling and sealing activities.[43] Without the road to the Port, the Mine would not have been possible.[44] NANA's interests in this litigation are similar. NANA has an interest in maintaining access to the lands located in the Ambler Mining District to protect its interest in the development of those resources. It also has an interest in ensuring it has a voice in any transportation project, to minimize the project's effect on subsistence and its shareholders' cultural activities.

The extent to which NANA's shareholders and other regional stakeholders rely on responsible resource development cannot be overemphasized. About half of NANA's shareholders reside in the NANA Region and over 96% of residents in the region identify as Iñupiat.[45] The Northwest Arctic Borough—which overlaps with NANA's boundaries—had a 2018 unemployment rate of 14.2%, and the cost of living there was approximately

---

[42] *Id.* at ¶ 6.
[43] *Id.*
[44] *Id.*
[45] Cravalho Decl. ¶ 10.

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG          10

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

61% higher than in Anchorage.[46] The region's geographic isolation, the high cost of energy, and the lack of broadband access all create ongoing barriers to the development of local economies.[47]

In 2018, mining accounted for 26% of all jobs in the NAB, second only to the government jobs sector.[48] The Mine has an average NANA shareholder hire of 55%, and since 1989 NANA shareholders working at the Mine have earned a combined $500 million.[49] NANA has also received over $2.3 billion in proceeds from the Mine and has paid out over $1.4 billion in revenue to the other ANCs under Section 7(i) of ANCSA.[50] In addition, the Mine has paid over $1.3 billion to the State of Alaska, including over $594 million to the Alaska Industrial Development and Export Authority (AIDEA) for use of the DMTS.[51] Over 90% of the Borough's budget comes from the Payment in Lieu of Tax Agreement that it holds with the Mine.[52] That agreement has an estimated value of $20–$26 million per year over 10 years.[53] The Borough uses the money to fund its programs and provide the required match to the State's funding to the Northwest Arctic Borough School District.[54] Revenue derived from the Mine also has allowed NANA to invest in its

---

[46] *Id.*
[47] *Id.*
[48] Monet Decl. ¶ 7.
[49] *Id.*
[50] *Id.*
[51] *Id.*
[52] *Id.*
[53] *Id.*
[54] *Id.*

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG          11

shareholders' communities through programs like the Village Economic Investment Program to support projects proposed by local communities and to grow their economies in ways they see as appropriate.[55] The revenue helps NANA support its shareholders' interests in the protection of subsistence, access to jobs, and dividends to help supplement the increased cost of living and cost of energy in the region.[56]

### D. It is critical that NANA continues to have a voice in the development of natural resources involving its lands and region.

There is no other party to this litigation that can speak to the environmental, social, and economic impacts of the Ambler Access Project from the perspective of NANA and its shareholders. It has a unique perspective on balancing the economic, subsistence and cultural interests at stake for its shareholders.

With Red Dog Mine approaching the end of its mine life,[57] new resource development opportunities are being explored in the region. Over the years, NANA has pursued other opportunities for mineral development potential through the Upper Kobuk Mineral Projects (Project) on lands that it owns located within the Ambler Mining District. No decision has been made as to whether other opportunities for mineral development, including through the Project are economically feasible to develop.[58]

---

[55] *Id.*
[56] *Id.*
[57] *Id.* at ¶ 8.
[58] *Id.*

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG            12

**STOEL RIVES** LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

NANA holds an interest in the Ambler Mining District through an agreement with Ambler Metals LLC that establishes the Project.[59] Like Red Dog Mine, one requirement for economic feasibility is a way of transporting ore to market. That requires access to the Project site.[60] In passing the Alaska National Interest Lands Conservation Act of 1980 (ANILCA), Congress recognized the importance of access to the Ambler Mining District.[61] ANILCA codified access through the Gates of the Arctic National Park and Preserve to safeguard access to and from the Ambler Mining District for future opportunities to responsibly develop it.[62]

AIDEA proposes to construct a controlled access, year-round, industrial road linking the Ambler Mining District to the Dalton Highway.[63] Throughout the review and permitting process, NANA has actively advocated for its shareholders' interests. They include: that access be protected, that subsistence activities be protected, that impacts to the environment be minimized or eliminated, and that communication with communities be consistent throughout the life of the project and in the development of its infrastructure.[64] NANA seeks to intervene in this litigation so it can continue that advocacy.

---

[59] *Id.*
[60] *Id.*
[61] Cravalho Decl. ¶ 11.
[62] *Id.*
[63] *See* 85 Fed. Reg. 45,440 (July 28, 2020) (FR Doc. 2020–16298).
[64] Cravalho Decl. ¶ 11.

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG          13

ANILCA describes a review process for crossing the Gates of the Arctic National Preserve "in lieu of an environmental impact statement which would otherwise be required under … National Environmental Policy Act," that specifically directs that impacts on traditional lifestyles must be considered as part of that analysis. Section 201(4)(d) states:

> The Secretaries [of Interior and Transportation]… shall consider the following—
>
> (ii) The environmental and social and economic impact of the right-of-way including impact upon wildlife, fish, and their habitat, in rural and traditional lifestyles including subsistence activities, and measures that should be instituted to avoid or minimize negative impacts and enhance positive impacts.[65]

No other party to this litigation can speak to the environmental, social, and economic impacts of the right-of-way from the perspective of NANA and its shareholders. This specifically includes their rural and traditional lifestyles and subsistence activities.

With uncertainty over the continuation of mineral development in the NANA Region after Red Dog, limited infrastructure to expand other economic opportunities, and the need to continue to protect subsistence and access to NANA's lands, NANA's primary interest remains protecting subsistence.[66] But NANA also seeks to preserve full access to the Ambler Mining District, whenever actual development occurs.[67] It is critical, therefore,

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

---

[65] ANILCA , Pub. L. 96-487, § 201 (4)(d)(ii).
[66] Monet Decl. ¶ 9.
[67] Id.

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG          14

that NANA have a voice in this litigation given that disposing of the action could have a profound effect on its future.[68]

## III. PROCEDURAL POSTURE

Plaintiffs challenge the federal agency decisions approving the Ambler Road Project, alleging violations of ANILCA, the National Environmental Policy Act (NEPA), the Clean Water Act, and the Federal Land Policy and Management Act. The relief sought by Plaintiffs—vacatur of the agency authorizations and the underlying environmental review documents as well as an injunction—could affect access to the Upper Kobuk Mineral Projects. Because such relief would impair its interests, NANA moves for intervention as of right or, alternatively, permissive intervention.

Plaintiffs filed a second amended complaint on March 26, 2021, which Defendants answered on April 9.[69] The administrative record has not yet been lodged nor have any dispositive motions been filed.

## IV. ARGUMENT

### A. NANA is entitled to intervene as of right.

A motion to intervene must be granted if four criteria are met: (1) the motion is timely, (2) the movant "claims an interest relating to the property or transaction that is the subject of the action," (3) the movant "is so situated that disposing of the action may as a

---

[68] *Id.*
[69] *See* Dkts. 45 and 46.

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

practical matter impair or impede the movant's ability to protect its interest," and (4) no existing party adequately represents that interest.[70] The Ninth Circuit applies this test broadly in favor of intervention:

> A liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts. By allowing parties with a *practical* interest in the outcome of a particular case to intervene, we often prevent or simplify future litigation involving related issues; at the same time, we allow an additional interested party to express its views before the court.[71]

NANA meets all four criteria. First, the motion comes before the Federal Defendants have lodged the administrative record and before any substantive issues have been decided, minimizing the risk of prejudice to any party. Second, NANA's interest in protecting its rights and obligations under ANCSA involving access to its lands and subsistence in its region now and for future generations are related to the issues before the Court in this action. Third, the manner in which the Court disposes of this action may significantly impair or impede NANA's ability to protect those interests. And, fourth, no existing party can speak for NANA in balancing and protecting the rights and obligations that are at the center of NANA's mission. Only NANA can represent its shareholders' economic interests while at the same time protecting the subsistence, historical, and

---

[70] Fed. R. Civ. P. 24(a).

[71] *United States v. City of L.A., Cal.*, 288 F.3d 391, 397–98 (9th Cir. 2002) (internal quotation marks and citation omitted; emphasis in original); *Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States*, 921 F.2d 924, 926 (9th Cir. 1990).

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG          16

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

spiritual values that its shareholders attach to the ancestral lands that NANA owns and manages on their behalf.

### 1.    The Motion is timely.

The timeliness of a motion to intervene depends on "(1) the stage of the proceedings; (2) whether the parties would be prejudiced; and (3) the reason for any delay in moving to intervene."[72] Under these criteria, NANA's motion is timely.

The proceedings are at an early stage. Defendants have filed portions of the administrative record, but the administrative record has not yet been lodged. Defendants are scheduled to produce additional records on May 21.[73] No dispositive motions have yet been filed. For reference, Ambler Metals and the Alaska Industrial Development and Export Authority (AIDEA) successfully moved to intervene before the administrative record was then due to be filed and prior to the deadlines for contesting the sufficiency of the record or moving to supplement.[74] NANA's motion comes at a similar stage in the current scheduling order.[75] Also, NANA has submitted a proposed answer to the Complaint along with this motion to avoid any possible delay.

---

[72] *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 836 (9th Cir. 1996) (citation omitted).
[73] *See* Dkt. 52.
[74] *See* Dkts. 17, 19 (motions to intervene); Dkt. 13 (scheduling order then in effect); Local Civ. R. for D. Alaska 16.3(b)(1).
[75] *See* Dkt. 52 (revised scheduling order).

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG                    17

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

For the same reason, no party would be prejudiced.[76] NANA is prepared to meet the Court's deadlines, coordinate with defendants and defendant-intervenors to streamline briefing, and participate in a manner that does not burden the efficient management of the case.

### 2. NANA has a legally protectable interest related to the Ambler Road Project.

Intervention as of right requires the movant to have an interest that is (1) "protectable under some law" and (2) related to the claims in the suit.[77] But to make this showing, "no specific legal or equitable interest need be established."[78]

NANA has several such interests. First, it owns and manages land over which part of the proposed road may run. It has multifaceted interests as an indigenous landowner that it needs to protect.[79] Second, it has a duty to promote the economic and social and personal well-being of its shareholders. Thus, NANA has an interest in preserving the historic and culturally significant character of the land while also ensuring the future economic success of the Iñupiat people.[80] Third, NANA has a duty to protect the option to pursue

---

[76] *See Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 837 (9th Cir. 1996) ("[The] motion to intervene does not appear to have prejudiced either party in the lawsuit, since the motion was filed before the district court had made any substantive rulings.").

[77] *Id.* (internal quotation marks and citation omitted).

[78] *Id*. (internal quotation marks and citation omitted); *see, e.g.*, *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (finding that conservation groups met this requirement based on their "interest in conserving and enjoying the wilderness character" of a section of a national forest).

[79] *See* Monet Decl. ¶ 2.

[80] *Id*. at ¶ 3.

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG                18

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

development of the Ambler Mining District. To do so, it must protect access to the area, which access is implicated by the Ambler Road Project.[81] Fourth, NANA has a deep and abiding interest in preserving its shareholders' ability to continue subsistence practices on its land.[82] These interests are at the core of NANA's existence.

### 3. NANA's interest may be impaired by the disposition of the action.

NANA's interests could be impaired by the disposition of the action if the Court were to enter a ruling that limited access. The mineral resources at issue are substantial, and their development is potentially very significant to NANA's economic future. Any ruling that limited access to those resources, as part of ruling on the agency approvals for the proposed road in question, could be very harmful to NANA. Likewise, NANA's interest in protecting subsistence and serving its land-management mission might be harmed by any disposition, including a possible settlement, that does not appropriately take these interests into account.[83]

### 4. NANA's interests are not adequately represented by existing parties.

A movant must meet the "minimal" burden of showing that existing parties might not adequately represent its interests.[84] In assessing this burden, courts consider whether a

---

[81] *Id*. at ¶ 8.
[82] *Id*. at ¶ 2.
[83] *Id*. at ¶ 9.
[84] *Southwest Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 822–23 (9th Cir. 2001).

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG                    19

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

current party will "undoubtedly" make all of the movant's arguments and whether the intervenor would "add some necessary element to the proceedings" that the parties would not.[85] To prevail, a movant "need only show that representation of its interests by existing parties 'may be' inadequate. In assessing the adequacy of representation, the focus should be on the 'subject of the action,' not just the particular issues before the court at the time of the motion."[86]

NANA meets this low bar. No current party has the same set of interests that NANA has. Specifically, NANA owns and manages land over which part of the western portion of the proposed Ambler Road may run.[87] And it has a unique interest in balancing the economic development of the NANA Region with the preservation of the historic, culturally important character of its lands, as well as the ability of its Iñupiat inhabitants to continue subsistence practices there.[88] None of the Federal Defendants, the State of Alaska, AIDEA, nor Ambler Metals has the same specific, permanent interests in the development of NANA's lands and the protection of its shareholders' subsistence and culture. As such, NANA has met its burden to show that its interests may not be adequately represented by current parties.

---

[85] *Blake v. Pallan*, 554 F.2d 947, 954–55 (9th Cir. 1977).
[86] *Berg*, 268 F.3d at 823 (citations omitted).
[87] Cravalho Decl. ¶ 11.
[88] *See* Monet Decl. ¶ 2.

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG        20

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

**STOEL RIVES** LLP
510 L Street, Suite 500, Anchorage, AK 99501
*Main (907) 277-1900 Fax (907) 277-1920*

**B.      Alternatively, NANA should be permitted to intervene under Rule 24(b).**

The Court may also permit NANA to intervene if it finds that NANA's motion is timely and its defense or claim "shares with the main action a common issue of law or fact."[89] Unlike intervention as of right under Rule 24(a), permissive intervention under Rule 24(b) does not require that NANA's interests are inadequately represented by the current parties. NANA may be permitted to intervene because (1) its motion is timely, as discussed above; and (2) its interests are at the core of this action. While NANA's interests are distinct, the core questions to be resolved are the same: whether the federal agencies' actions were unlawful, and whether the Ambler Road project should be enjoined.[90] For these reasons, NANA also meets the criteria for intervention under Rule 24(b).

**V.      CONCLUSION**

For the foregoing reasons, NANA's motion to intervene should be granted as a matter of right under Rule 24(a). Alternatively, the Court should permit NANA's intervention under Rule 24(b).

---

[89] Fed. R. Civ. P. 24(b)(1)(B).
[90] *See, e.g.*, *Eyak Pres. Council v. U.S. Forest Serv.,* No. A03-180CV (JWS), 2003 WL 24085349, at *2 (D. Alaska Dec. 9, 2003) (finding that a movant's proposed defense of a federal agency's decision against a NEPA claim meets this criterion).
*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG                 21

DATED: May 18, 2021

STOEL RIVES LLP

By:/s/ James E. Torgerson

James E. Torgerson (Bar No. 8509120)
Beth S. Ginsberg (Pro Hac Vice Pending)
James C. Feldman (Bar No. 1702003)
Connor R. Smith (Bar No. 1905046)

*Attorneys for Proposed Intervenor-Defendant*
*NANA Regional Corporation, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on May 18 , 2021, I filed a true and correct copy of the foregoing document with the Clerk of the Court for the United States District Court, District of Alaska, by using the CM/ECF system. Participants in this Case No. 3:20-cv-00187-SLG, who are registered CM/ECF users, will be served by the CM/ECF system.

/s/ James E. Torgerson

James E. Torgerson

STOEL RIVES LLP
510 L Street, Suite 500, Anchorage, AK 99501
Main (907) 277-1900 Fax (907) 277-1920

*Northern Alaska Environmental Center, et al. v. Haaland, et al.*
Case No. 3:20-cv-00187-SLG                    22